Filed 10/2/13 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S042346 |
| v. | ) | |
| | ) | |
| BRYAN MAURICE JONES, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. CR 136371 |
| _____ | ) | |

**ORDER MODIFYING OPINION AND
DENYING PETITION FOR REHEARING**

THE COURT:

The opinion herein, filed August 26, 2013, and appearing at 57 Cal.4th 899, is modified as follows:

1. On page 942 of 57 Cal.4th, the following paragraph is deleted:

"As previously noted, we agree with respondent that a challenge to the *Kelly* third prong goes to the weight, not the admissibility, of the evidence. (*People v. Brown*, *supra*, 91 Cal.App.4th at p. 647.) We thus reject at the outset any suggestion the trial court erred by admitting the evidence."

2. Also on page 942, the first sentence following the deleted paragraph is deleted. The deleted sentence reads: "We also reject the argument that Dr. Blake's rebuttal evidence failed to satisfy *Kelly*'s third prong." Substitute this new sentence reading: "We reject this argument."

1

This modification does not affect the judgment.

The petition for rehearing is denied.

Filed 8/26/13 (unmodified version)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)      S042346
      v. )
)
BRYAN MAURICE JONES, )
)      San Diego County
      Defendant and Appellant. )    Super. Ct. No. CR 136371
_____)

A jury in San Diego County Superior Court convicted defendant Bryan Maurice Jones in 1994 of the first degree murders of JoAnn Sweets and Sophia Glover (Pen. Code, §§ 187, 189; all further statutory references are to this code unless otherwise indicated), attempting to murder Maria R. and Karen M. (§§ 664/187), and committing forcible rape, sodomy and oral copulation against Karen M. (§§ 261, subd. (a)(2), 286, subd. (c), 288a, subd. (c)). The jury further sustained an allegation that defendant used a deadly weapon when attempting to murder Maria R. (§ 12022, subd. (b).) Finally, the jury sustained three special circumstance allegations rendering defendant eligible for the death penalty: that he murdered both Sweets and Glover during the commission or attempted commission of the crime of sodomy (§ 190.2, subd. (a)(17)), and that he committed multiple murders (§ 190.2, subd. (a)(3)). Although defendant was also charged with murdering two additional victims, one with special circumstances, the jury failed to return a verdict on those counts, and they were not retried. On

1

April 6, 1994, following a penalty trial, the jury set the punishment at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in all respects.

## I. GUILT PHASE

### A. Facts

In 1985 and 1986, defendant lived with his mother, Ann Jones, in an apartment on 51st Street in San Diego. Ann Jones worked 24 hours a day, five days a week, as an in-home nurse tending to the needs of an elderly woman named Tillie Wilsie, who lived on Mississippi Street, also in San Diego. Defendant would often spend weekends at the Wilsie home, including time when his mother was not present. He had a key to the Wilsie home.

At the time of the crimes, defendant was six feet five inches tall, weighed approximately 300 pounds, and was familiar with the martial art of karate. He occasionally borrowed his sister's car, a 1980 Datsun "280Z" with faded blue two-tone paint.

#### 1. Maria R.

Maria R. testified that on August 15, 1985, she was homeless and living on the street. She used heroin two or three times a week but was not high that day. She struck up a conversation with defendant, and he offered her $20 for sex. She did not usually engage in prostitution but would occasionally do so. She agreed, and they took the bus to defendant's apartment on 51st Street. Maria R. had sex with defendant in the apartment, he paid her, and she took a shower. When she emerged from the shower, defendant had a rope in his hand. He forcibly placed the rope around her neck, jumped on her back and started choking her with his hands and the rope. She blacked out; when she awoke, defendant attacked her again, and she again blacked out. When she awoke a second time, defendant told

2

her she would have to orally copulate him if she wanted him to let her go. She complied because she "wanted [her] life" and had no choice. Defendant released her after first taking back his $20.

Although Maria R. had had problems with the police before, she reported the crime to them. She accompanied police to the apartment building where she had been assaulted and hid while they brought defendant outside. Defendant was taken into custody but after his release a few days later, she returned to the apartment with some people from a church, who apparently tried to dissuade defendant from attacking her again.

The jury found defendant guilty of attempting to murder Maria R. using a deadly weapon, i.e., a rope. (§§ 664/187, 12022, subd. (b).)

### 2. Tara Simpson

Two weeks later, on August 29, 1985, police and firefighters responded to a report of a fire in a dumpster in the alley behind defendant's apartment on 51st Street. The fire had been set intentionally using an accelerant. After dousing the fire, responders found in the dumpster the body of Tara Simpson, an 18-year old African-American prostitute, burned almost beyond recognition. Although the severity of the burning made forensic examination difficult, an autopsy revealed a traumatic injury to her nose that was not caused by the fire, an incised injury like a knife wound in her abdomen, and evidence of asphyxia (small petechial hemorrhages on the surface of the heart), but no trauma to her throat or airway. Swabs revealed the presence of acid phosphatase in her mouth, vagina and rectum, suggesting seminal fluid. There being no aspirated soot in her lungs, she had died before being burned, probably of alcohol and cocaine poisoning. Although defendant was charged with murdering Simpson, the jury hung eight to four in favor of guilt.

3

### 3. *Trina Carpenter*

Five and one-half months later, on February 11, 1986, firefighters responded to another dumpster fire in the same alley, about one block away from where they found Simpson's body. It also was started with an accelerant. After dousing the fire, they found inside the dumpster the body of Trina Carpenter, a 22-year old African-American prostitute. Her body bore evidence of bruising and other injuries around her neck, and tests showed she had cocaine and/or cocaine metabolites in her body when she died. An autopsy concluded she died from asphyxia caused by strangulation.

Carpenter's body had been placed in a duffel bag before being put in the dumpster and set alight. The bag contained two cotton balls, one in her hand and one inside the duffel bag. The cotton balls bore evidence of spermatozoa and epithelial cells. In addition, vaginal swabs indicated the presence of spermatozoa as well as a high concentration of acid phosphatase, indicating the presence of seminal fluid. Swabs from Carpenter's mouth and rectum were negative for evidence of sexual activity. Genetic testing of the cotton balls found sperm contributed by more than one man to be present, but the predominant contributor was someone of defendant's genotype. A population frequency analysis shows this genotype appears in approximately 15 percent of the African-American population.

On the evening Carpenter was killed, a witness heard a "very loud thunk" emanating from the alley where Carpenter's body was eventually found. The witness looked out her window and saw an older car with blue oxidized paint near the dumpster where Carpenter's body was later found. When firefighters arrived, the car was gone. Although defendant was charged with Carpenter's murder, the jury hung 11 to one in favor of guilt.

### 4. JoAnn Sweets

Two and one-half months later, on May 9, 1986, police found the body of JoAnn Sweets. She was in a dumpster behind defendant's apartment, just one block from where police had found Carpenter's body and steps from where Maria R. was assaulted. She was unclothed except for a bra and blouse. Sweets, a 34-year old African-American woman, had been killed by manual strangulation and had severe injuries to her face and neck. She also had a broken neck, clavicle and rib. Cocaine was detected in her body. Her body was wrapped in a bed sheet and a mattress pad and then placed in two plastic garbage bags sealed with tape. Everything in the dumpster was covered by an afghan blanket.

Defendant's sister, L.A., told police she was almost 100 percent sure her mother had crocheted the blanket, although she backtracked somewhat at trial. Carpet fibers found on Sweets's blouse, the mattress pad and the afghan blanket matched the carpet in defendant's apartment on 51st Street. Using a process called vacuum metal deposition, police also discovered defendant's fingerprints and one of his palm prints on the plastic garbage bags. They also found his fingerprint on the dumpster.

Oral and vaginal swabs of Sweets's body tested negative for spermatozoa. Some sperm was detected on rectal swabs, but not enough to test. The bed sheet in which Sweets was wrapped was stained with semen, and a genetic test determined that more than one man had produced the stains. Defendant's genotype was represented in the stains, and epithelial cells found on the unstained portion of the sheet were also consistent with defendant's genotype.

The jury convicted defendant of the first degree murder of Sweets and sustained a special circumstance allegation that he killed her while engaged in the commission or the attempted commission of a forcible sodomy. (§§ 187, 189, 190.2, subd. (a)(17).)

*5. Sophia Glover*

On August 15, 1986, about three months after police found JoAnn Sweets's body, police discovered the lifeless body of Sophia Glover rolled in a blanket and placed on the grassy area between the sidewalk and the street, about a block from the Wilsie home on Mississippi Street. Glover, a 37-year-old African-American woman, was living on the streets at the time she was killed and may have been a prostitute. Her body bore severe trauma to the head, neck and chest, and she had cocaine in her system when she died. An autopsy determined she died of asphyxia due to manual strangulation. One of Wilsie's neighbors found Glover's clothes neatly folded and stacked in a nearby alley.

A small amount of spermatozoa was found on a vaginal swab taken from Glover's body, and both spermatozoa and acid phosphatase, indicative of seminal fluid, were found on an anal swab. The amount of genetic material on the vaginal swab was deemed insufficient for testing, but the spermatozoa on the anal swab was consistent with defendant's genotype and subject to the same population statistics, i.e., 15 percent of the African-American population has that genotype.

The jury convicted defendant of the first degree murder of Glover and sustained a special circumstance allegation that he did so while engaged in the commission or attempted commission of a forcible sodomy. (§§ 187, 189, 190.2, subd. (a)(17).)

*6. Bertha R.*

Evidence of defendant's crimes against Bertha R. was admitted as tending to prove his identity, motive, and intent in the charged crimes. Bertha, an African-American woman, testified that on October 16, 1986, about two months after Glover was killed, she was in a telephone booth on El Cajon Boulevard looking up the address of a check-cashing store so she could cash a check. Bertha was employed as a cook and was not a prostitute, although El Cajon Boulevard was a

6

street where many prostitutes worked. Defendant pulled up in a blue Datsun 280Z, engaged her in conversation, told her he knew the location of the check-cashing place, and offered her a ride. Bertha thought he seemed nice so she agreed, and he drove her to the store. The computers were down at the check-cashing store, however, so defendant suggested she hang out with him and she agreed. He drove her to a home she later identified as the Wilsie home on Mississippi Street. Once inside, they smoked a marijuana cigarette.

As they sat on the sofa watching television, he asked her if he would "be too forward if he asked me to kiss [him]." She declined the kiss. They continued to watch television but he suddenly grabbed her neck very tightly from behind. He had a knife in the other hand and told her that if she did not do what he said, he would kill her. He then forced her to disrobe and attempted to sodomize her. When he was unsuccessful at achieving penetration, he raped her. As she got dressed, he went through her purse and took $65 in cash. After she was dressed, he said, "I have got to find someplace to put you." He took her back to his car and they drove to Fiesta Island. Once there, he told her he knew where she lived and he would kill her family if she reported the crime. He then forced her to orally copulate him in the car. From there they drove around the San Diego area, but when she told him she was about to vomit he let her out of the car and she escaped.

Defendant was tried separately for these crimes, convicted of several felonies and sentenced in 1987 to 22 years in prison.

### 7. *Karen M.*

On October 20, 1986, just four days after assaulting Bertha R., Karen M., an admitted drug addict and prostitute, was on the street near 29th Street and Imperial Avenue when defendant pulled up in a blue/gray Datsun 280Z. He

7

solicited her for an act of prostitution and she agreed. Although her preference was to have a "car date," defendant said he had a house and took her to the Wilsie house on Mississippi Street. Once there, she remarked that she had a bottle of Jack Daniel's whiskey and offered him some, so he went into the kitchen to get a glass while she disrobed. When she asked about her payment, he placed her in a choke hold from behind, completely lifting her off the floor by her neck. He told her to do as he said or he would kill her. She was beginning to black out, so she agreed.

After defendant released her from the choke hold, he forced her to drink a large glass of whiskey, which made her sick. She told him she would do whatever he wanted and pleaded with him not to hurt her. She then orally copulated him; he attempted to sodomize her but was unsuccessful. Defendant attempted several more sex acts and continued to force the victim to drink whiskey. She eventually passed out and was discovered by Marjorie Wilsie, who had come to the house to clean up following her mother-in-law's death two weeks earlier. The police responded to the scene and although Karen M. protested that she was guilty of nothing more than prostitution, she was arrested for burglary and sent to a detoxification center. She told police she had been raped, but they did not then believe her.

With regard to the crimes involving Karen M., the jury convicted defendant of attempted murder and three forcible sex crimes: rape, sodomy and oral copulation. (§§ 664/187, 261, subd. (a)(2), 286, subd. (c), 288a, subd. (c).) The jury also sustained a multiple-murder special-circumstance allegation. (§ 190.2, subd. (a)(3).)

8

## B. Pretrial Issues

### 1. Dismissal of Prospective Juror Based Solely on His Written Responses on the Jury Questionnaire

Defendant contends his penalty judgment must be reversed because the trial court improperly excused Prospective Juror A.M. for cause based on his views on capital punishment, solely as expressed in his written responses on the jury questionnaire. As we explain, although we reject respondent's contention that defendant forfeited this claim, the record nevertheless suggests that defense counsel acquiesced in the juror's excusal. In any event, the record shows the court could properly exclude the identified juror for cause without undertaking a further in-person exploration of the juror's views concerning capital punishment.

The record reveals the trial court was interested in streamlining the jury selection process and informed the parties that if, after reading the jury questionnaires, the court strongly believed a particular juror was biased and thus unsuitable to sit on the jury, it intended to excuse the juror without any oral voir dire. The prosecutor objected to this proposal and asked the court to follow "statutory procedure" in which the two sides alternate challenging jurors for cause, but the court overruled the objection, explaining its proposed procedure would save time. Defendant joined the prosecutor's objection.

After the trial court questioned the suitability of one juror and excused him when neither party objected, the prosecutor suggested that counsel for both sides could simply list the jurors they believed could be excluded for cause based on the jurors' questionnaire answers. Counsel could see if both sides listed some of the same jurors, and then the court could suggest others. The court agreed. Defense counsel then listed several prospective jurors they felt were excludable for cause and the parties discussed those jurors. Some were retained (at least temporarily, pending further inquiry) and some were excused for cause. The prosecutor then

identified jurors he believed were excludable for cause. The first on the prosecution's list was Prospective Juror A.M., about whose exclusion defendant now complains. The prosecutor explained why, based on A.M.'s questionnaire answers, he believed "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) The prosecutor noted that based on his answers, A.M. "quite candidly comes out and tells us he can't kill anyone." The trial court suggested it tended to agree and asked defense counsel to comment on the merits of the prosecutor's assertion. Defense counsel replied: "With regard to—well, he indicates that he—*we will submit it on this one*, your honor." (Italics added.) The court then excused Prospective Juror A.M. for cause.

We reject respondent's contention that defendant forfeited the claim, for when this pretrial proceeding occurred in 1994, an objection was not necessary to preserve this type of error for appeal. (*People v. Velasquez* (1980) 26 Cal.3d 425, 443 [discussing *Witherspoon*[1] error]; see *People v. Bivert* (2011) 52 Cal.4th 96, 112 [recognizing the *Velasquez* rule].) We recently reexamined the *Velasquez* "no forfeiture" rule and unanimously overruled it for cases tried in the future. (*People v. McKinnon* (2011) 52 Cal.4th 610, 637-643; *id.*, at p. 699 (conc. & dis. opn. of Werdegar, J.) [expressly agreeing with the majority on this point].)

Although we find no forfeiture on this record, we also find no error. Under *Wainwright v. Witt*, *supra*, 469 U.S. 412, " '[a] prospective juror who would invariably vote either for or against the death penalty because of one or more

---

[1]      *Witherspoon v. Illinois* (1968) 391 U.S. 510 was the precursor to *Wainwright v. Witt*, *supra*, 469 U.S. 412, which explains the federal standard for removing prospective jurors in a capital case due to their views on capital punishment.

circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause . . . .' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 671.) "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176.)

" '[A] prospective juror in a capital case may be discharged for cause based solely on his or her answers to the written questionnaire *if it is clear from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law.*' " (*People v. Wilson* (2008) 44 Cal.4th 758, 787, quoting *People v. Avila* (2006) 38 Cal.4th 491, 531.) The juror's written answers need not, however, dispel "*all possible or theoretical* doubt" regarding the juror's fitness to serve (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 647), and on appeal we evaluate the question of a juror's fitness to serve de novo (*id*., p. 648).

Prospective Juror A.M.'s jury questionnaire shows that although he was generally pro-prosecution, he held strong, religion-based views against capital punishment. Answering question 76, he wrote: "I have a real problem with the death penalty. Life comes [from] God. I don't feel I could be [a] party to killing another person regardless of the justification." Answering question 91, he wrote: "God gives life [and] only God should take life." Asked in question 93(c) whether his opposition to the death penalty would "substantially impair" his ability to vote for the death penalty, he gave this terse response: "There are no appropriate circumstances to kill."

Because those who oppose capital punishment may still serve on a capital jury, the key questions were questions 103 and 104, which concerned the guilt and

11

penalty phases, respectively. Question 103 asked in pertinent part: "[S]hould you be selected to sit as a juror on this case, do you feel you are able and willing to completely put aside any thought or concern relating to penalty issues while you deliberate *the question of guilt* on these charges?" (Italics added.) Prospective Juror A.M. did not check the box for either "Yes" or "No," and instead wrote: "Possibly." Question 104 asked: "Having heard the Court's orientation and procedures for a death penalty trial, *can you follow the instructions of the Court given to you in this case?*" (Italics added.) Prospective Juror A.M. wrote: "[N]ot in the penalty part." By these answers, A.M. made clear that he could not, and would not, consider the death penalty as a possible punishment in this case. Because his views would thus " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' " (*Wainwright v. Witt*, supra, 469 U.S. at p. 424), the trial court properly excluded him without orally questioning him.

### 2. *Wheeler/Batson*

During jury selection, after the prosecution used peremptory challenges to excuse two African-American prospective jurors, Y.J. and C.G., defendant moved to quash the venire, citing *People v. Wheeler* (1978) 22 Cal.3d 258. The trial court found defendant had made a prima facie showing of group bias, whereupon the prosecutor stated his reasons for his challenges. The court proclaimed it was "completely satisfied" with those reasons and denied the motion. Defendant renewed his *Wheeler* motion when the prosecutor challenged and excused another prospective juror, N.S.[2] As to N.S., the trial court found no prima facie showing

---

[2] Defendant also cited the excusal of a fourth prospective juror, an African-American man, in this second motion but does not renew the claim on appeal.

had been made.  Defendant renews these claims on appeal, arguing these three jurors were excused based on their race.

Under both *People v. Wheeler*, *supra*, 22 Cal.3d 258, and its federal constitutional counterpart, *Batson v. Kentucky* (1986) 476 U.S. 79, a party who believes his opponent is using peremptory challenges animated by a prohibited discriminatory purpose must first make a prima facie showing of such group bias. (*People v. Lenix* (2008) 44 Cal.4th 602, 612; *Johnson v. California* (2005) 545 U.S. 162, 168.)  "In order to make a prima facie showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.' " (*People v. Gray* (2005) 37 Cal.4th 168, 186.)  The objecting party must then produce evidence " 'sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " (*Ibid.*, quoting *Johnson v. California*, *supra*, at p. 170.)  This prima facie assessment is sometimes called "the first stage of a *Batson* inquiry." (*People v. Mills* (2010) 48 Cal.4th 158, 174.)

If the defendant succeeds in establishing a prima facie case, the burden shifts to the prosecutor to justify the challenges. (*People v. Lenix, supra,* 44 Cal.4th at p. 612.)  The court then evaluates the prosecutor's responses to determine whether purposeful discrimination has been proven.  At this so-called third stage of the *Batson* inquiry, the trial court often bases its decision on whether it finds the prosecutor's race-neutral explanations for exercising a peremptory challenge are credible.  " 'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*Lenix*, at p. 613, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix, supra*, 44 Cal.4th at p. 613.) We have explained that " 'the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor,' " that " 'these determinations of credibility and demeanor lie " 'peculiarly within a trial judge's province,' " ' " and that, thus, " ' "in the absence of exceptional circumstances, we would defer to [the trial court]." ' " (*Id.*, at p. 614, quoting *Snyder v. Louisiana* (2008) 552 U.S. 472, 477.)

Here no dispute exists that defendant made a prima facie case with regard to Jurors Y.J. and C.G. He objected and made his record. Respondent concedes both women were African-Americans and thus were members of a cognizable class. We then turn to the trial court's evaluation of the prosecutor's reasons for excusing the women. "The proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) " '[E]ven a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix, supra,* 44 Cal.4th at p. 613.)

With regard to Prospective Juror Y.J., the prosecutor stated numerous reasons why he excused her. He explained the prosecution had devised a numerical score for each prospective juror based on their desirability, and Y.J. rated very poorly. She had worked at the Job Corps, and because defendant had attended there, the prosecutor thought some mitigating evidence related to that organization might be introduced at the penalty phase. He did not "want to take

14

the chance that [it] will and that [Y.J.] will have a link to this man because of her employment and his connection to the Job Corps." In addition, Y.J. was twice divorced, and both her children were either separated or divorced. "That shows me some instability that I am not comfortable with." Additionally, she expressed interest in being a counselor, "a helping person, someone to get everyone better. I see that as . . . contrary . . . towards what I will be asking them to do; that is, to kill this defendant." She was a loner; she expressed the view that the police sometimes "shoot too quickly," suggesting some hostility to law enforcement; she was seeing a psychiatrist; her support for the death penalty was "weak" and "she says she dislikes making this very crucial decision."

Defendant attacks each of these explanations separately as pretextual, but he did not raise these arguments below. Moreover, even assuming a suspicion of pretext could be raised as to one or two of these reasons, the persuasive power of all of them, taken together, convinces us that our usual deference to the trial court's assessment of the prosecutor's sincerity is appropriate. Here, the prosecutor's expressed apprehension about the Job Corps connection between defendant and Y.J. seems a legitimate concern unrelated to race. In addition, other matters that can justify a peremptory challenge are a prospective juror's "negative views of the police" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1102), "a juror's experience in counseling or social services" (*People v. Clark* (2011) 52 Cal.4th 856, 907 [juror was a "licensed pastoral counselor"]; *People v. Landry* (1996) 49 Cal.App.4th 785, 790-791 [work in youth services might suggest bias in a defendant's favor]), and a juror's experience with psychology (*People v. DeHoyos* (July 8, 2013, S034800) __ Cal.4th ___, ___ [p. 37] [juror's "educational background, interest, and experience in the field of psychology was a race-neutral reason justifying his excusal"]; *Clark*, *supra*, at p. 907 [juror had taken college courses in psychology]). Finally, "[a] prospective juror's reluctance to vote for a

15

penalty verdict of death is a permissible, race-neutral reason for exercising a peremptory challenge." (*People v. Elliott* (2012) 53 Cal.4th 535, 561.)

With regard to Prospective Juror C.G., the prosecutor stated that he had also rated her very low because she exhibited "liberal tendencies." He based his views on her involvement with the restoration of wetlands in the Famosa Slough, along with her involvement with the "San Diego Environmental Project, [and the] Equal Employment Opportunity [Commission]." In addition, she did not read the newspaper, she was dissatisfied about a police response to a burglary, her questionnaire suggested she would apply a "shadow of a doubt" standard rather than a beyond a reasonable doubt standard, she had doubts about the persuasiveness of circumstantial evidence, and she was seeing a therapist for depression. Defendant criticizes some of these reasons (for example, the prosecutor may have exaggerated her negative views about police, and her views on reasonable doubt and circumstantial evidence were expressed before the court educated her on the law) and argues they were pretextual. We defer, however, to the trial court's assessment of the prosecutor's reasons as being subjectively genuine. (*People v. Reynoso, supra,* 31 Cal.4th at p. 924.)

For example, we need not debate whether the policies of certain organizations are liberal or not; the prosecutor's subjective distrust of jurors affiliated with such organizations—if genuine—is sufficient to support the juror challenge. (*People v. Ward* (2005) 36 Cal.4th 186, 202, citing *People v. Wheeler*, *supra*, 22 Cal.3d at p. 275 [subjective mistrust of a juror's objectivity is sufficient].) That the prosecutor was genuinely concerned about C.G.'s views on the People's burden of proof and the power of circumstantial evidence is shown by his specific questioning of her on these topics. As with Prospective Juror Y.J., her psychological issues (she admitted she had been very depressed and had been seeing a therapist periodically) could legitimately raise red flags for the

16

prosecutor. The trial court declared itself "very satisfied that the reasons stated are substantial and do not relate to color whatsoever. [¶] I will indicate that I noticed [Prospective Juror C.G.] almost looked like she was in tears when she was explaining the tragedies she has personally gone through over the last few years and it's pretty heart-breaking." We defer to this conclusion that the prosecutor's reasons for excusing C.G. were not based on group bias.

Defendant further argues the prosecutor excused Prospective Juror N.S. based on her race. Unlike with the excusals of Prospective Jurors C.G. and Y.J., the trial court declined to find defendant had satisfied his burden of demonstrating a prima facie case with regard to N.S.; therefore, this is a *Batson* first-stage issue and we have no explanation by the prosecutor to evaluate. In addition, the record reveals the trial court was uncertain what standard to apply in determining whether defendant had carried his prima facie burden.[3] Under such circumstances,

---

[3]    Earlier in the voir dire, when discussing defendant's *Wheeler/Batson* motion in connection to Prospective Juror C.G., the following colloquy occurred:

"[THE COURT:]  I am going to ask you to state your reasons, in any event. *This is not an issue that is very clear to me. I do not feel that the case law gives a lot of help [in]this regard with respect to when that prima facie case has been made.*

"And I am just going to be very frank. I think that the trial court does not have enough guidance to be real firm. The first time around I have no problem whatsoever. There absolutely was nothing on which to do it. This time I just don't know. *I am not clear.* And I am going to ask you to, for that reason, to state your reasons why you would . . . exercise a peremptory as to [Prospective Juror C.G.].

"[THE PROSECUTOR]:  If I may, I think the law is clear that there must be *a substantial showing* that the challenges are being exercised for race and race alone.

"I don't think that showing has been made, and I haven't heard the court say that, 'yes, I think there is a prima facie showing.' " (Italics added.)

As the United States Supreme Court made clear in *Johnson v. California*, *supra*, 545 U.S. 162, however, *Batson* requires only that the objector state facts

*(footnote continued on next page)*

17

deference to the trial court's ruling is inappropriate and we instead review the record independently.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 487; *People v. Bonilla* (2007) 41 Cal.4th 313, 342.)

Assessing the record independently, we find ample evidence to support the trial court's ruling that defendant failed to establish a prima face case of group bias with regard to Prospective Juror N.S.  The prospective juror revealed in her questionnaire that she had been married to a man who had been convicted of murder.  "[A] prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution."  (*People v. Farnam* (2002) 28 Cal.4th 107, 138.)  Accordingly, our independent review of the record reveals adequate support for the trial court's decision not to find a prima facie case of group bias with regard to Prospective Juror N.S.

### 3. Speedy Trial

The People alleged defendant assaulted Maria R. on August 15, 1985.  Although the victim's complaint led to defendant's arrest shortly thereafter, he was not then prosecuted, probably because the victim did not appear in the district attorney's office for an interview, and she later called the police department to say she did not intend to pursue the matter.  The police nevertheless knew the facts of the Maria R. incident, as they were mentioned in the 1987 sentencing documents

---

*(footnote continued from previous page)*

giving rise to a reasonable inference of discrimination in order to satisfy the prima facie burden.  Language in some California state cases requiring a showing of a " 'strong likelihood' " of discrimination, or that a peremptory challenge was " '*more likely than not*' " motivated by group bias, incorrectly articulated the applicable standard.  (See *People v. Gray*, *supra*, 37 Cal.4th at pp. 186-187.)

for the Bertha R. case.  Although the statute of limitations for any potential sex crimes committed against Maria R. expired after six years, or around mid-August 1991, defendant was eventually charged with attempting to murder Maria R. in a complaint filed on January 7, 1993.  An information charging that attempted murder, along with the murders of Simpson, Carpenter, Sweets and Glover, and the sexual assault and attempt to murder Karen M., was filed on January 14, 1993, and then amended twice in January 1994.

Defendant moved to dismiss all charges on state and federal due process and speedy trial grounds.  The trial court denied the motion, finding the delay had not prejudiced defendant.  Although the court noted that defendant could raise the issue again following trial, when the extent of any possible prejudice would be more apparent, the court reiterated its ruling when defendant raised the issue again in a motion for a new trial.  Now on appeal, defendant renews his state and federal due process and speedy trial claims, but raises only the delay in charging him with attempting to murder Maria R.  (That was the oldest of the crimes charged, with a delay of nearly seven years.)

We recently set forth the law applicable to this claim:  "A defendant's state and federal constitutional speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1) do not attach before the defendant is arrested or a charging document has been filed.  (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.)  Nonetheless, a defendant is not without recourse if a delay in filing charges is prejudicial and unjustified.  The statute of limitations is usually considered the primary guarantee against overly stale criminal charges (*People v. Archerd* (1970) 3 Cal.3d 615, 639), but the right of due process provides additional protection, safeguarding a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material

19

physical evidence (*Nelson,* at p. 1250).

"A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. (*People v. Archerd, supra,* 3 Cal.3d at pp. 639-640.) Prejudice to a defendant from precharging delay is not presumed. (*People v. Nelson, supra,* 43 Cal.4th at p. 1250; *People v. Catlin* (2001) 26 Cal.4th 81, 107.) In addition, although 'under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. . . . If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' (*Nelson,* at pp. 1255-1256.) If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. (*Nelson*, at p. 1250.) But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified. (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 249; *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 506.)" (*People v. Abel* (2012) 53 Cal.4th 891, 908-909, fn. omitted.) Although defendant frames his claim as one under both the federal and state Constitutions, "[b]ecause the law under the California Constitution is at least as favorable to defendant as federal law, we apply California law to defendant's claim." (*Abel*, at p. 909, fn. 1.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) In evaluating the correctness of a trial court's denial of a defendant's speedy trial motion, we consider all evidence that was before the court at the time the trial court ruled on the motion. (*Ibid*.) Thus,

20

evidence presented at trial may be used to support or reject defendant's posttrial assertion of his speedy trial rights.

We begin with the question of prejudice because it is dispositive. Defendant's case for prejudice hinges on his claim the delay in charging interfered with his ability to present exculpatory evidence of Maria R.'s alleged apology for falsely accusing him. (*Post*, pt. I.C.4.) Arguing in favor of the speedy trial motion before trial, defense counsel asserted defendant's ability to contest the Maria R. charges had been hampered because her memory had faded over the years: "When questioned at the preliminary hearing, [Maria R.] acknowledged having gone back to the defendant's house after this incident with some preacher, but denied even remembering who the individual was or how she got there or really what was discussed at that time. [¶] These kinds of things, when they were left to be investigated until two, three, four years later and as much as five years later, certainly the lapse of time affects the ability of the defense to present any kind of response to the charges."

The trial court found no prejudice. While admitting the delay may have caused some memories to fade, the court noted that in a large case with many witnesses, some delay, and thus the possibility that some memories may fade, is inevitable. But considering defendant's showing, the court noted, "Most of what has been offered to the court is purely speculative." "[W]hat's being proffered to the court is this person might have been able to help the defendant, but you can't put your finger on it. [¶] And I recognize that's the dilemma the defense faces, but the law looks at that and says not good enough, and so I can't find that it's good enough." The court also observed that because some of the witnesses were drug users, some memory loss on their part could be expected even if the case had been brought promptly. Finally, the court suggested it did not view the defense's assertions of lost evidence favorably because many of defense counsel's other

21

claims of lost evidence—unrelated to the crimes against Maria R.—proved to be false.[4]

We find no abuse of discretion. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 431.) Although defendant contends he lost two "important" witnesses (presumably the two people who came to his mother's home and delivered Maria R.'s alleged apology for falsely accusing him) and that the memories of two more witnesses (Maria R. and defendant's mother) had faded as a result of the delay, we agree with the trial court's assessment that this evidence of prejudice is speculative. Maria R. was a habitual drug user, and the trial court reasonably concluded her memory would not have been the best in any case. Although defendant's pretrial motion briefly mentioned his mother, Ann Jones, and claimed her lack of memory of the alleged apology incident was due to the delay, defense counsel's voluminous declaration in support of the pretrial motion makes scant mention of either Maria R.'s or Ann Jones's faded memory. Regarding counsel's asserted inability to find the couple who allegedly came to Jones's door, neither defendant's pretrial motion nor counsel's supporting declaration mentions this point. A defense investigator's extensive declaration, submitted in support of the pretrial motion, briefly mentions the alleged apology incident but it does not say he attempted to locate either of the two persons who came to the Jones home, let alone that he was unsuccessful.

Regarding defendant's posttrial speedy trial motion, we conclude the trial

---

[4] For example, defense counsel claimed under penalty of perjury that the following evidence could not be found due to the passage of time: defendant's school records, defendant's sister's car (a distinctive blue Datsun 280Z) and garbage company records indicating when the dumpster in which one of the victims was found was last emptied. The prosecution showed these claims were false.

testimony supports the trial court's conclusion that any potential prejudice flowing from the delay was speculative. Although Ann Jones testified at trial and suggested she could not say with assurance the woman who came to the door (and allegedly apologized) was Maria R., the trial court reasonably discounted this evidence because Maria R.'s testimony describing the crime against her "was strikingly similar to Karen [M.'s] and Bertha [R.'s]. She had no motive to lie, and her immediate report to the police about the rope was very significant because the rope was found in the apartment. [¶] So it was . . . an extremely strong case." The court found similarly speculative defendant's claim that his asserted inability to locate the two people who allegedly visited Ann Jones's home was traceable to the passage of time. Although defense counsel argued he had acted reasonably and diligently in looking for the man described as a preacher,[5] the trial court found "that it would be completely speculative as to whether that minister could have been located, even had this case proceeded within a few months of the crime itself."

"Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) We cannot say on this record that the trial court acted in such

---

[5] Counsel Varela explained: "We have tried every church thing. I mean, I went walking up and down, up and down El Cajon [Boulevard]. I went to a Praise the Lord Fellowship on 51st; tried to contact a bunch of them. I walked to anything that looked like it was there. Nobody remembered anything about anything at that time. [¶] And then I tried looking and seeing if I could find anybody that had Spanish-speaking evangelical services that did outreach programs, and, you know, I was running into walls everywhere. There was just—nobody remembered. Nobody knows."

a manner in denying defendant's pretrial and posttrial speedy trial motions. Because we conclude the trial court acted within its broad discretion in finding defendant was not prejudiced by the delay in charging him with attempting to murder Maria R., we need not address defendant's further argument challenging the prosecutor's multiple justifications for the delay or the trial court's acceptance of those reasons.

### 4. *Severance*

Defendant was charged jointly with murdering four women (Tara Simpson, Trina Carpenter, JoAnn Sweets, Sophia Glover) and attempting to murder Maria R. and Karen M. He moved before trial to sever the murder counts from the attempted murder counts, citing section 954 and his right to due process under both the state and federal Constitutions. After discussing the various factors for and against joinder, the trial court denied the severance motion, explaining: "Overall, in looking at this, first I have to say that the charges are initially properly joined under [section] 954 because they are offenses of the same class and they are connected together by common elements of substantial importance, and I believe that severance is not warranted because I do not believe that this appears to be an unjustified negative impact by a joinder against the defendant. The probative value is extremely high, and the negative impact is not unfair, in my estimation, in looking at this overall."

Section 954 governs the issue of joinder of counts and it provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of *the same class of crimes or offenses*, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts

24

set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (Italics added.) As defendant concedes, murder and attempted murder are of the same class of crimes within the meaning of section 954. (*People v. Jenkins* (2000) 22 Cal.4th 900, 947.) The statutory requirements for joinder thus being satisfied, defendant " 'can predicate error in denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion.' [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 855.)

" 'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

Defendant presents three reasons he claims show the joinder of claims prejudiced him. First, he argues evidence supporting the four murder counts would not have been cross-admissible in a separate trial of the two attempted murder counts. But " 'cross-admissibility is not the sine qua non of joint trials.' " (*People v. Geier* (2007) 41 Cal.4th 555, 575.) Section 954.1 makes this clear, directing that, "[i]n cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading . . . , evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact."

25

In any event, the trial court considered the cross-admissibility issue, noting "the overwhelming marked distinctiveness of the m.o. [modus operandi] in all the cases." We agree. Evidence that a person has committed other crimes is not rendered inadmissible by Evidence Code section 1101, subdivision (a) if relevant to prove such facts as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident" (*id*., subd. (b)), and we understand the trial court's reference to proving an offender's "m.o." (i.e., modus operandi) to mean proof of intent, plan or identity. (See *People v. Maury* (2003) 30 Cal.4th 342, 393 ["the similarities of the offenses . . . were sufficient to establish a common modus operandi, raising a strong inference [of identity]"]; *People v. Kraft* (2000) 23 Cal.4th 978, 1062 [commonality and distinctiveness of certain features of the various crimes suggested the killer's modus operandi, and were relevant to prove his identity]).

Evidence of other crimes can be admitted to prove the offender acted according to a certain plan, or acted with a particular motive, if a degree of similarity exists between the past and present crimes so as to permit a reasonable inference that the offender must have entertained the same intent in both instances. But to use evidence of prior crimes to prove the identity of the offender in the present crime requires the highest degree of similarity between the past and present crimes. "For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)

We cannot say the trial court abused its discretion by finding a common modus operandi sufficient to deny severance.  In this case, in the space of a few months,[6] someone began attacking lone women, often prostitutes, along or near El Cajon Boulevard in San Diego, a street known to be populated by women engaging in prostitution.  With one exception,[7] the victims were all African-American.  Defendant attacked Maria R. at his 51st Street apartment and attacked Karen M. at the Mississippi Street home where his mother worked.  The bodies of all four murder victims were found in close proximity to one of those two residences.  All victims were sexually molested.  Three of the murder victims were found in dumpsters; the body of the fourth victim (Glover) was rolled in a blanket and discarded on the area between the sidewalk and the street, like garbage.  Maria R. and Karen M. were attacked after consenting to have sex for money; as the four murder victims were all prostitutes, it is likely they were lured to their deaths by a perpetrator using the same ruse.  All victims were either choked or strangled; none was shot.  Under these circumstances, that the crimes would have been cross-admissible in separate trials to establish a common and distinctive modus operandi is likely.  "To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed the crimes." (*People v. Maury*, *supra*, 30 Cal.4th at p. 392.)

---

[6]     The first attack was against Maria R. on August 15, 1985.  The ensuing crimes occurred on August 29, 1985 (Tara Simpson), February 11, 1986 (Trina Carpenter), May 9, 1986 (JoAnn Sweets), August 15, 1986 (Sophia Glover), October 16, 1986 (Bertha R.), and October 20, 1986 (Karen M.).

[7]     Maria R. has a Hispanic surname.

27

Defendant next contends joinder permitted the prosecution to bolster the allegedly weaker murder counts (JoAnn Sweets, Sophia Glover) with the stronger attempted murder counts, both by inflaming the jury and by allowing it to aggregate evidence of identity. The trial court explicitly considered this point but rejected it after carefully considering the argument. We find no abuse of discretion. At the threshold, we question the premise, that is, that the evidence was so weak as to some counts and so strong as to others that the stronger counts would fill in the gaps in the evidence for the weaker counts. Although both Maria R. and Karen M. identified defendant as their assailant, the evidence of those counts was not necessarily exceptionally strong, as both victims were subject to impeachment on the grounds they were prostitutes and drug addicts. Maria R., moreover, had dropped the initial prosecution. Further, the evidence of defendant's involvement in the Sweets murder, although circumstantial, was quite strong. Police discovered seminal fluid at the scene consistent with his genotype, his fingerprints were on the garbage bag containing the victim's body, and carpet fibers on the victim matched those in his apartment. Only as to Glover was the evidence somewhat weak, but as the trial court reasoned, clear evidence of a consistent modus operandi justified joinder.

Nor is there merit to defendant's claim that joinder allowed the jury to aggregate the evidence. That the jury was able to consider each case on its individual merits is shown by its failure to reach a unanimous verdict on the counts involving Simpson and Carpenter. Where the jury returns a guilty verdict of a lesser crime, or, as here, fails to convict at all on some charges, we are confident the jury was capable of, and did, differentiate among defendant's crimes. (*People v. Ruiz* (1988) 44 Cal.3d 589, 607.)

Finally, citing *Williams v. Superior Court* (1984) 36 Cal.3d 441 in support, defendant argues the trial court "failed to acknowledge its duty of heightened

scrutiny as compelled by the presence of the capital charges." We indeed stated in *Williams* that "the court must analyze the severance issue with a higher degree of scrutiny and care than is normally applied in a noncapital case." (*Id*., at p. 454.) But we have since qualified *Williams*, explaining that "the subsequent enactment of section 790, subdivision (b)—which, as noted, specifically provides for joinder of *capital* cases such as these—makes it clear that such a heightened analysis is no longer called for."[8] (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1229, fn. 19.) In any event, because the Maria R. and Karen M. charges did not elevate the Sweets and Glover murders into capital offenses, any concern over the unfairness of joining capital and noncapital charges is minimal. (*People v. Vines*, *supra*, 51 Cal.4th at p. 855.)

## C. Trial Issues

### 1. *The Bertha R. Evidence*

Prior to trial, the prosecution moved to present evidence that on October 16, 1986, defendant assaulted, and forcibly raped and sodomized Bertha R. under circumstances similar to the charged crimes against JoAnn Sweets, Sophia Glover, Tara Simpson, Trina Carpenter, Maria R. and Karen M. The prosecution argued

---

[8] Section 790, subdivision (b) provides: "If a defendant is charged with a special circumstance pursuant to paragraph (3) of subdivision (a) of Section 190.2, the jurisdiction for any charged murder, and for any crimes properly joinable with that murder, shall be in any county that has jurisdiction pursuant to subdivision (a) for one or more of the murders charged in a single complaint or indictment *as long as the charged murders are 'connected together in their commission,' as that phrase is used in Section 954*, and subject to a hearing in the jurisdiction where the prosecution is attempting to consolidate the charged murders. If the charged murders are not joined or consolidated, the murder that was charged outside of the county that has jurisdiction pursuant to subdivision (a) shall be returned to that county." (Italics added.)

29

in its written motion that the evidence was admissible under Evidence Code section 1101 "to prove the following issues in dispute: "A. the identity of defendant; [¶] B. the intent of the defendant as demonstrated by: [¶] 1. Motive; [¶] 2. a common plan, scheme and modus operandi." In support of its motion, the prosecution attached a transcript of Bertha R.'s preliminary hearing testimony. Opposing the motion, the defense argued, "The factual dissimilarities between these unrelated cases are apparent." Defendant highlighted four aspects of his crimes against Bertha R. that differed from the charged offenses: she was not a prostitute; he approached her and offered her a ride without requesting an act of prostitution; one of the forcible sex acts occurred in his car rather than in the apartment; and he threatened her with a knife. The trial court announced its tentative position was to grant the prosecution's motion and admit the evidence, but invited final argument from defense counsel. Counsel then reiterated many of the points in his written opposition.

The trial court ruled Bertha R.'s testimony was admissible to prove defendant's motive, intent and identity, reasoning, "the marks of distinction outweigh those that would be dissimilarities. And, again, the clear mark of distinction that stands out in this case, the Bertha [R.] case, is the force used on an otherwise willing sexual partner. [¶] She may not have been a prostitute, but she was willing to go with the defendant to the house on Mississippi Street four days before the [Karen M.] case." "I think these distinctive common marks tie it into [the Karen M. case] and tie it into the rest of the cases, and, therefore, it is probative. It's highly probative and goes to the question of identity, motive, intent, which is all at issue in this case."

30

At trial, prior to Bertha R.'s testimony, the trial court gave the jury a limiting instruction applicable to her testimony.[9] The witness then testified. She related how defendant engaged her while she was walking on El Cajon Boulevard, how she agreed to "hang out" with him, how he drove her in his blue Datsun 280Z to the Wilsie home on Mississippi Street, how when she refused to kiss him he put his arm around her neck from behind and strangled her, threatened her with a knife, attempted to forcibly sodomize and then raped her, stole money out of her purse, forced her to drive around with him, and forced her to orally copulate him in his car before she escaped. Prior to the jury's guilt phase deliberations, the trial court again gave the jurors a limiting instruction.

---

[9] "Ladies and gentlemen, please pay attention. This is one of the instructions that I will be giving you at the end of the trial also. It's called a limiting instruction. It means that some evidence may come in and you may consider it for certain purposes, but not for other purposes.

"Evidence may be introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial.

"Such evidence, if believed, will not be received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes.

"Such evidence may be received and may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent, which is a necessary element of the crime charged, the identity of the person who committed the crime, if any, of which the defendant is accused, or a motive for the commission of the crime charged.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose. This would be circumstantial evidence and will be also subject to other instructions on circumstantial evidence, as well."

31

## a. Challenge to the Admission of the Evidence

Defendant renews his argument the trial court erred under Evidence Code section 1101 by admitting Bertha R.'s testimony. As noted (*ante*, at p. 26), subdivision (a) of that section provides a general evidentiary rule of exclusion, providing that "evidence of a person's character . . . in the form of . . . *evidence of specific instances of his or her conduct* . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Italics added.) The scope of that rule is clarified in subdivision (b): "Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as *motive*, opportunity, *intent*, preparation, plan, knowledge, *identity*, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Italics added.)[10]

The rules governing the admissibility of evidence under this section are well settled. " ' "Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]" [Citation.] In cases in which the

---

**10** Shortly after defendant was tried in 1994, the Legislature added section 1108 to the Evidence Code. (Stats. 1995, ch. 439, § 2, p. 3429.) This new statute "loosened the restrictions on the admissibility of other-crimes evidence in cases involving sex crimes" (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1002, fn. 7), by creating an explicit exception to the restrictions of Evidence Code section 1101. Because the Legislature intended "to expand the admissibility of disposition or propensity evidence in sex offense cases" (*People v. Falsetta* (1999) 21 Cal.4th 903, 911), had section 1108 existed at the time of defendant's trial, the statute likely would have justified the admission of evidence of defendant's sexual crimes against Bertha R.

32

prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility "depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity." ' [Citation.] A somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.) On appeal, we review a trial court's ruling under Evidence Code section 1101 for abuse of discretion." (*People v. Roldan* (2005) 35 Cal.4th 646, 705.)

As noted, *ante*, in contrast to using evidence of other crimes to prove "motive, opportunity, intent, preparation, [or] plan" (Evid. Code, § 1101, subd. (b)), the admissibility of Bertha R.'s testimony to prove defendant's identity as the assailant of JoAnn Sweets, Sophia Glover, Maria R. and Karen M. requires a higher degree of distinctiveness and commonality between the Bertha R. crimes and the crimes against the other victims. "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.) Accordingly, we first consider whether the evidence could be admitted to prove defendant's identity, because if it was admissible for that purpose, it necessarily would also have been admissible to prove defendant's intent and motive, which require a lesser degree of distinctiveness.

The key issue in this case was identity. No witness came forward to identify defendant as the person who killed JoAnn Sweets or Sophia Glover.

33

Substantial forensic evidence linked defendant to Sweets (fingerprints on the trash bag, DNA evidence, the afghan blanket, carpet fibers), however, making that case stronger than the one involving Glover. From Glover's body police had obtained DNA evidence that was only moderately incriminating, placing the donor of that semen sample—and defendant's sample—within 15 percent of the African-American population. But a pattern emerged among the cases. Someone was preying on African-American women in a certain area of San Diego in 1985 and 1986. All the victims were lone women, encountered, or likely encountered, on the street. All were, or likely were, contacted on or around El Cajon Boulevard in San Diego, an area frequented by prostitutes. All save Maria R. were African-American and all save Bertha R. were, or likely were, prostitutes or homeless women living on the streets. Three victims who survived the attacks — Maria R., Karen M., and Bertha R. — identified defendant and described how they were taken to either his apartment on 51st Street or the Wilsie home on Mississippi Street (to which he had access). That the surviving victims were able to identify the apartments where they were brutalized is significant because the women who were killed were all found in close proximity to one of these residences. All of the women were manually strangled. All of the women were forced into brutalizing sex acts. Several of the victims testified to, or their bodies bore evidence of, anal sex. Drugs and alcohol were also a theme. The bodies of the women who lost their lives were treated like trash, found discarded in a dumpster or, in Glover's case, rolled in a blanket and placed curbside as if she were a piece of refuse. For the victims who were or likely were prostitutes (Maria R., Tara Simpson, Trina Carpenter, JoAnn Sweets, Sophia Glover, Karen M.), we may assume they went with defendant of their own free will. We may also assume they were willing to have sex with defendant, albeit for money. Although Bertha R. was not a prostitute and denied she was willing to have sex, defendant encountered her

34

walking alone on a street known for its prostitutes and he may have believed she was a prostitute. She admitted she went with defendant to the Wilsie home willingly.

Given these other common and distinctive facts, we must ask: Did the trial court abuse its discretion in concluding these crimes bore such common and distinctive marks that the person who committed *one* of them likely committed *all* of them? Viewing the evidence in a light most favorable to the trial court's ruling (*People v. Carter* (2005) 36 Cal.4th 1114, 1148), we conclude in the negative. That some distinctions exist, as defendant contends, is true, but "[t]o be highly distinctive, the charged and uncharged crimes need not be mirror images of each other." (*Ibid.*)

Defendant emphasizes that unlike the other victims, Bertha R. was neither a prostitute nor a homeless person. But that she was walking alone on El Cajon Boulevard, known as a place where prostitutes gathered, and accepted a ride from defendant, a total stranger, tends to blunt the importance of the fact she was not a prostitute. As the trial court explained, "[s]he may not have been a prostitute, but she was willing to go with the defendant to the house on Mississippi Street." Defendant also argues that—contrary to the trial court's expressed justification for admitting the evidence—Bertha R. was not a willing sex partner because she told defendant she did not want to kiss him. But defendant may have believed she was a compliant partner, as she agreed to come to a strange house with a strange man and smoke marijuana with him. She also otherwise fit the pattern of lone African-American women defendant encountered along El Cajon Boulevard, took to one of his residences, and then choked and forced to have sex in multiple and brutalizing ways. Further, that Maria R., Karen M., and Bertha R. were not deposited in a dumpster or treated like garbage is of no moment because they managed to escape with their lives.

35

Defendant also argues no evidence showed Sweets and Glover were also willing sex partners, but inferences from the evidence suggested both women were prostitutes. Indeed, in arguing against the persuasiveness of the prosecution's DNA evidence, defense counsel admitted all of the victims were prostitutes. In any event, at the time the trial court ruled on the pretrial motion, defendant's own moving papers described Sweets and Glover as "known drug user[s] and prostitute[s]." Nothing defense counsel said in arguing the motion before the trial court contradicted this. We cannot fault the court for proceeding on the understanding that Sweets and Glover had been willing sex partners.

Defendant further contends the court erred by considering the use of force on a willing sex partner to be a distinctive feature of the crimes. He notes violence against prostitutes is now and was in fact at the time common in San Diego. But he did not make this argument to the court below, so we cannot fault the court for failing to consider it. The same is true of defendant's further claim that the existence of copycat killers undermines the persuasiveness of the People's argument that the Bertha R. crimes were similar to the charged crimes.

For a number of other reasons, defendant seeks to distinguish the Bertha R. crimes from those against the other victims. For example, Bertha R. alone was threatened with a knife. But that she was also strangled tends to diminish the importance of that fact. That defendant drove her around the city and forced to commit a sex act in his car distinguishes her case somewhat from the others, but by the time defendant assaulted Bertha R., he may have decided to stop discarding his victims' bodies in dumpsters behind his own apartment, prompting his chilling comment to her that " 'I have got to find someplace to put you.' " Although defendant's crimes against Bertha R. were not wholly identical to those against Maria R., Karen M., JoAnn Sweets and Sophia Glover, we find the trial court did

36

not abuse its discretion in admitting her testimony.  (*People v. Rogers* (2006) 39 Cal.4th 826, 862; *People v. Roldan*, *supra*, 35 Cal.4th at p. 705.)

The relative distinctiveness of the Bertha R. crimes aside, defendant contends the trial court erred in admitting evidence of them because, although his identity was in issue, his intent and motive in the Sweets and Glover crimes were not.  We disagree.  The prosecution was required to prove not only that defendant was the killer, but that he killed intentionally while committing the charged sex crimes.  (*People v. Kipp* (1998) 18 Cal.4th 349, 371-372.)  Bertha R.'s evidence was thus relevant and its admission did not contravene defendant's due process rights.

Defendant also contends the trial court erred in admitting the evidence because identity, intent and motive were not at issue in the Maria R. or Karen M. crimes.  We disagree.  Assuming without deciding defendant objected on this specific ground, we find the court properly admitted the evidence.  To be sure, both Maria R. and Karen M. identified defendant as their assailant.  But in proving the culprit's identity, the People were entitled to bolster the victims' in-court identifications with additional evidence.  Moreover, because defendant was charged with attempting to kill both victims, Bertha R.'s evidence was relevant to demonstrate his probable intent and motive; that is, that he intended to kill them.  Intent to kill is, of course, an element of the offense of attempted murder.  (*People v. Osband* (1996) 13 Cal.4th 622, 683.)

Defendant also contends admission of evidence of the crimes against Bertha R. violated his federal right to due process of law.  It does not appear defendant moved to exclude the evidence on this ground below.  Assuming without deciding we may reach this constitutional issue, we reject it because defendant fails to persuade us the admission of the Bertha R. evidence "rendered

his trial so fundamentally unfair that it violated his due process rights." (*People v. Roldan*, *supra*, 35 Cal.4th at p. 705, fn. 23.)

### b. *Challenge to the Jury Instructions*

Defendant next argues the trial court's jury instruction on the subject of Bertha R.'s evidence was erroneous and requires reversal. We disagree. The trial court delivered this basic instruction to the jury: "Evidence has been introduced in this trial for the purpose of showing that the defendant committed crimes against Bertha [R]. Defendant is not charged in this trial with crimes relating to Ms. [R]. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered only for the limited purpose of determining if it tends to show: [¶] The existence of the intent, which is a necessary element of crimes charged; [¶] The identity of the person who committed the crimes, if any, of which the defendant is accused; [¶] A motive for the commission of the crimes charged; [¶] And for the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

Defendant contends that "[w]ithout at least proof that Sophia Glover and JoAnn Sweets were prostitutes, there was no evidence that either was a willing sexual partner. Thus, applying the court's reasoning, the jury had no basis for determining that the Bertha [R.], Sophia Glover, and JoAnn Sweets offenses all [bore] the same signature." This argument, though framed as a challenge to the jury instruction, merely reprises the issue of whether the evidence was admissible, a claim we have previously rejected in connection with defendant's challenge to the trial court's denial of his severance motion. (See pt. B.4, *ante*.) Once the

38

court ruled on that motion and admitted the evidence, the court was obliged to instruct the jury on its proper consideration. That the court instructed the jury that "[s]uch evidence was received and may be considered only for the limited purpose of determining *if it tends to show*" intent, identity or motive (italics added), also undermines defendant's argument, for if the jury had found the crimes too dissimilar, we presume it would have found the evidence did not tend to prove intent, identity or motive. Because the instruction correctly stated the applicable law, we also reject defendant's argument the instruction violated his due process rights.

Defendant next argues the jury instructions on other crimes evidence violated his right to due process under the state and federal Constitutions because no rational way existed for the jury to make the connection between defendant's guilt of the other crimes and his guilt of the present crimes. (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) That is, he contends the jury instructions allowed the jurors to rely improperly on a permissive presumption to establish his identity as the killer under circumstances in which it cannot be said " 'with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.' " (*Id*., at p. 166, fn. 28; see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1243-1244 [rejecting the same argument in connection with the pattern instruction on the inference of a consciousness of guilt arising from flight].) We reject the argument, because "reason and common sense amply justified the suggested conclusion" that the person who committed the Maria R., Karen M, and Bertha R. crimes likely committed the very similar Simpson, Carpenter, Sweets and Glover crimes. (*People v. Yeoman* (2003) 31 Cal.4th 93, 131 [rejecting the same argument in connection with CALJIC No. 2.06 (attempt to suppress evidence indicates a consciousness of guilt)].)

39

## 2. *Admission of DNA Evidence*

### a. *The Evidence*

Dr. Edward Blake testified as an expert for the prosecution and related the results of his testing of genetic material found at three of the crime scenes. Regarding sperm and epithelial cells on two cotton balls found with Trina Carpenter's body, the evidence suggested two different sperm donors. Dr. Blake analyzed the sample's deoxyribonucleic acid (DNA) with a process known as polymerase chain reaction, or PCR. His examination of the gene known as DQ-Alpha indicated someone belonging to a population group consistent with defendant's DNA had deposited the greater amount of sperm. According to Dr. Blake, a population frequency analysis of the 21 different DQ-Alpha genotypes has shown that defendant's genotype appears in approximately 6 percent of the African-American population, 5 percent of the Caucasian population, and slightly more than 2 percent of the Mexican-American population.

On rebuttal, Dr. Blake testified that he also subjected the genetic material on the cotton balls to a different kind of PCR test called polymarker analysis. This method compared five different genes rather than the single gene used in the DQ-Alpha test and was thus more precise. Because the defense argued that Carpenter was likely killed by Randy Lockwood, La-Jon Van Reed, or Prince Johnson, individuals who were involved in the drug trade milieu of which the victim was a part, Dr. Blake used the polymarker analysis to test samples from those three men as well as defendant. The results of this second round of testing showed defendant could not be eliminated as the donor of the sperm found on the cotton balls, and that neither Lockwood, nor Reed, nor Johnson was the donor.

Although no sperm was found on oral or vaginal swabs taken from JoAnn Sweets's body, and the amount of sperm on the rectal swab was too small to test for DNA, five areas of the bed sheet in which Sweets's body was wrapped showed

signs of semen and were tested for genetic markers. Dr. Blake found a mixed sample of semen (i.e., from more than one donor) on the bed sheet and his analysis on cuttings from the sheet using the PCR DQ-Alpha technique showed the sperm was deposited by someone belonging to a population group consistent with defendant, as judged by the same frequency statistics as above. On rebuttal, Dr. Blake testified the results of the polymarker DNA test showed he could not eliminate defendant as the donor of the semen found on the bed sheets. Although defendant had suggested Sweets's erstwhile boyfriend, Ike Jones, was responsible for her death, Dr. Blake concluded that a DNA comparison of the bed sheet stain with a genetic sample from Ike Jones showed he was not one of the donors.

Sperm and seminal fluid were found on a swab taken from Sophia Glover's rectum and Dr. Blake's PCR DQ-Alpha analysis of that swab showed the sperm cells were consistent with defendant's DNA, as judged by the same population frequency statistics. On rebuttal, Dr. Blake testified that his polymarker analysis suggested the sperm from the swab was "fairly evenly balanced" between two donors of sperm, and that possibly the sperm from a third donor was also present. In light of this new evidence, Dr. Blake revised his estimate of how frequently the particular genetic pattern appeared, saying that 15.1 percent of the African-American population (including defendant) matched the possible genotypes found on the swab. In other words, Dr. Blake could not eliminate defendant as the donor, but defendant was not the only contributor to the sample drawn from Glover's body.

### b. PCR Analysis of the DQ-Alpha Gene

Defendant moved before trial to exclude Dr. Blake's intended testimony, citing *People v. Kelly* (1976) 17 Cal.3d 24. *Kelly* was the genesis of a rule,

41

previously called the "*Kelly/Frye* rule,"**11** that governs the admissibility of evidence derived from new scientific techniques. "Under *Kelly,* the proponent of evidence derived from a new scientific technique must establish that (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 445.) After considering what it characterized as "mounds of material" that both the defense and the prosecution submitted, the trial court ruled Dr. Blake's intended testimony satisfied the *Kelly* test.

Defendant does not specifically argue that PCR analysis of the DQ-Alpha gene itself fails the *Kelly* test. Rather, he launches a more specific, four-part challenge to the trial court's ruling. We note that since the time of defendant's trial, "[c]ourts have applied the *Kelly* three-pronged approach to various techniques used in forensic DNA testing" (*People v. Henderson* (2003) 107 Cal.App.4th 769, 777), including PCR, the method used in this case. PCR "takes small pieces of DNA and copies or amplifies them[, and] is used when the DNA sample is too small or degraded to perform the [restricted fragment length polymorphism] method." (*Id*., at p. 778.) "PCR analysis of DQ alpha involves three general steps. First, DNA is extracted from the nucleus of cells present in an unknown bloodstain. Second, the DQ Alpha is replicated or amplified by a process which involves combining the DNA with a commercially available

---

**11** See *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014, superseded by statute as explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579.

solution or 'cocktail' and then subjecting the solution to a series of controlled temperature cycles. Finally, the amplified gene is typed in order to identify the alleles[12] present in the amplified DNA." (*People v. Morganti* (1996) 43 Cal.App.4th 643, 662, fn. omitted.) PCR testing of the DQ-Alpha gene also works for semen stains. (*People v. Reeves* (2001) 91 Cal.App.4th 14, 24-25.)

PCR analysis of the DQ-Alpha gene is now firmly established as a scientific technique that satisfies the *Kelly* test. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 448; *People v. Morganti*, *supra*, 43 Cal.App.4th at p. 669.)[13] "Once a published appellate decision has affirmed admission of a scientific technique, the technique's general acceptance is established as a matter of law. Further hearings on general acceptance are unnecessary 'at least until new evidence is presented reflecting a change in the attitude of the scientific community.' [Citations.]" (*Doolin*, *supra*, at p. 447.)

Apparently accepting the scientific community's approval of PCR testing in general, defendant argues that, by admitting Dr. Blake's testimony, the trial court

---

**12** "Because there is no practical way to sequence all three billion base pairs in a person's DNA, forensic scientists seek to identify individuals through variations in their base-pair sequences at polymorphic DNA locations (loci). Each variation in sequence is called an 'allele.' " (*People v. Venegas* (1998) 18 Cal.4th 47, 59, fn. omitted.) "In genetics, 'allele' usually means an alternate form of *gene* on one of a pair of chromosomes at a particular locus. In forensic analysis, the term is expanded to include an alternate form of any base-pair sequence." (*Id*., at p. 59, fn. 10.)

**13** Defendant suggests *Morganti* is distinguishable because it was "not a mixed sample case." Subsequent to *Morganti*, however, published cases have held that because PCR has attained a consensus in the scientific community as a valid procedure, its use for mixed-source samples does not constitute a new scientific procedure separately subject to *Kelly*. (See, e.g., *People v. Stevey* (2012) 209 Cal.App.4th 1400, 1411; *People v. Smith* (2003) 107 Cal.App.4th 646, 665.)

nevertheless erred in four specific ways: (1) Dr. Blake's use of something called "dot intensity" analysis to determine the genotypes present in a mixed-donor sperm sample was not admissible because this method was not generally accepted in the scientific community; (2) Dr. Blake used incorrect scientific procedures to identify possible genotypes present in the samples tested; (3) Dr. Blake's use of population frequency statistics was flawed; and (4) Dr. Blake's conclusions from conducting a polymarker analysis were inadmissible because he failed to follow proper scientific procedures. As we explain, admission of Dr. Blake's testimony did not result in reversible error.

### c. Dot Intensity Analysis

The PCR DQ-Alpha method tests for the presence or absence of six common identifiable alleles at the DQ-Alpha genetic marker. An individual's genotype for the DQ-Alpha marker is composed of a pair of alleles. "The six DQ-Alpha alleles can be paired to form 21 distinct genotypes, meaning the human population can be divided into 21 population groups. Ultimately, the DQ-Alpha genotype of the sample is determined by the presence of blue dots on test strips that indicate an allele of the sample DNA bonded with a specific DNA sequence or 'primer' on the test strip." (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 446-447.)

When a sample being tested has more than one donor, scientists compare the intensity of the blue color of the dots on the resulting test strip to identify the genotype of the alleles from the primary contributor of the sample. (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 446-447.) The dots of a " 'minor' contributor to the mixed DNA sample, for example, [have] 'significantly less' color intensity than [those] of a 'major' contributor." (*Id*., at p. 447.) As Dr. Blake testified, "if you have an unequal mixture, . . . the sample that is there at the lowest level will produce relatively faint typing dots relative to the sample that's present at a higher

44

level, and that's reflected in the typing result." Moreover, the "density of the color" of the resulting dots further indicates which alleles belong together in a mixed-donor sperm sample. Dr. Blake testified at the preliminary hearing that comparing the dots' color intensities to determine the alleles of the primary and secondary donors was a valid technique, citing an article he cowrote and another authored by two other experts.[14] He was unaware of any other articles on the subject, although he was sure there were some.

Defendant objected to this methodology, arguing: "None of the other material provided, and in particular the [National Research Council] report does not support Dr. Blake's conclusion that you can tell a primary from a secondary donor, if you will, nor that you can even tell which alleles go together in a situation where maybe you have four as opposed to which you would expect to find two. You can't really tell which of those go together based on the kind of testing, and all that is, in fact, available." After considering all the evidence and argument, the trial court concluded: "I think that Blake's procedures have been substantiated as correct scientific procedures. They are [a] little bit different, but substantiated." Although the court made no specific or separate ruling on Dr. Blake's use of the dot intensity analysis, and defendant did not press the court for

---

[14] See Blake, et al., *Polymerase Chain Reaction (PCR) Amplification and Human Leukocyte Antigen (HLA)-DQ$\alpha$ Oligonucleotide Typing on Biological Evidence Samples: Casework Experience* (May 1992) 37 J. Forensic Sciences 700. Dr. Blake asserts in the article that "the resulting dot intensity" from a PCR DQ-Alpha analysis can be used to distinguish the genotypes present in a mixed sample.

See also Comey & Budowle, *Validation Studies on the Analysis of the HLA DQ$\alpha$ Locus Using the Polymerase Chain Reaction* (Nov. 1991) J. Forensic Sciences 1633 (reaching the same conclusion).

a specific ruling (see *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [party seeking to preserve a claim for appeal must "secure an express ruling from the court"]), we assume the trial court's reference to Dr. Blake's "procedures" is broad enough to encompass a ruling on the dot intensity analysis.

We have previously encountered a claim that the dot intensity analysis associated with PCR DNA testing fails the *Kelly* test. We noted that "[w]hether 'dot-intensity analysis' is a novel technique requiring its own proof of general acceptance has not been addressed in a California published opinion." (*People v. Doolin*, *supra*, 45 Cal.4th at p. 448.) We declined to address the merits of the claim in *Doolin* because, inter alia, any error was harmless. (*Ibid*.) Here, too, we need not address the merits of defendant's claim because even were we to assume the dot intensity analysis performed by Dr. Blake constitutes a new scientific technique and not merely an expert's opinion based on observable scientific data (see *People v. Stoll* (1989) 49 Cal.3d 1136, 1157 ["absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly* . . . ."]), and if we further assume the People's showing concerning the dot intensity analysis was deficient under *Kelly*, defendant suffered no prejudice.

Dr. Blake's testimony describing his DNA analysis played no role in defendant's convictions for attempting to murder Maria R. and Karen M., and the jury did not reach a verdict on the murder counts involving Trina Carpenter and Tara Simpson. Therefore, Dr. Blake's evidence is significant on appeal only to the murder counts involving Sophia Glover and JoAnn Sweets. But with regard to the Glover counts, Dr. Blake's initial testimony, which was based on his use of the dot intensity technique in connection with the PCR DQ-Alpha test and identified defendant's genotype on the anal swab drawn from Glover's body, was superseded by his testimony on rebuttal, in which he described the results of his later, more precise polymarker analysis. Thus, even assuming for argument the People's

46

*Kelly* showing for the dot intensity technique was deficient, because of the witness's own re-evaluation of the sperm sample using a later test that was both more accurate and not reliant on the dot intensity technique, it is not reasonably probable the verdict would have been more favorable absent the challenged portion of Dr. Blake's evidence. (See *People v. Doolin*, *supra*, 45 Cal.4th at p. 448.)

We reach the same conclusion with regard to the counts involving JoAnn Sweets. Dr. Blake testified he tested a semen stain on a bed sheet found with Sweets's body and identified a genotype with alleles 1.2, 2, consistent with that of defendant. Dr. Blake admitted, however, that the sperm was a mixed sample, and the stain could have been deposited by someone with the alleles 1.2, 1.2. Because defendant presented evidence suggesting a third party named Ike Jones, whose genotype included the 1.2, 1.2 alleles, could have been Sweets's killer, Dr. Blake could not rule him out at that earlier period. On rebuttal, however, Dr. Blake described the results of his polymarker testing and concluded that Ike Jones could be excluded as a possible donor of the bed sheet stain, but that defendant's "genotypes in each one of these genetic marker systems is compatible with the type found in the sperm [sample]." As with Dr. Blake's testimony concerning Sophia Glover, his rebuttal evidence reflecting the more accurate polymarker testing rendered harmless any deficiency in the People's *Kelly* showing regarding the dot intensity analysis in connection with the initial PCR DQ-Alpha testing.[15]

We thus conclude that, even assuming for argument that the People failed to demonstrate the scientific community had generally accepted the dot intensity

---

[15] To the extent defendant also challenges the testimony based on the polymarker test as to the crimes against Sweets, even if we accepted that challenge any error would be nonprejudicial, as discussed, *post*, at page 52.

47

technique at the time of defendant's trial, any error in admitting Dr. Blake's testimony was harmless under any standard in light of his rebuttal testimony describing the results of his polymarker DNA testing.

### d. Kelly's Third Prong: Relevance

Defendant next argues the trial court erred in admitting Dr. Blake's testimony because "[t]he prosecution . . . failed to carry its burden under *Kelly*'s third prong, which requires proof that Dr. Blake used proper scientific procedure to determine that [defendant's] DNA and the perpetrator's DNA matched." He claims Dr. Blake used an incorrect scientific procedure to identify possible genotypes present in the samples he tested because, having found two donors in the samples swabbed from Glover, Carpenter and Sweets, it was equally possible that instead of finding a donor matching defendant's genotype (by pairing two of the four alleles identified in the sample) and a second, unknown donor (whose genotype was identified by pairing the remaining two alleles in the sample), a different combination of the four alleles would have revealed two donors, neither of whose genotype matched defendant's. According to defendant, "[i]f the prosecution could not establish which genotype the perpetrator possessed at that locus [i.e., at the DQ-Alpha locus], there was no relevant evidence to admit from that locus" (citing *People v. Pizarro* (2003) 110 Cal.App.4th 530, 600-601), and the DNA evidence was just as likely to exonerate as inculpate him. Under such circumstances, he argues, the trial court should have excluded the evidence as irrelevant.

The gist of this argument seems to be one of relevance rather than a complaint about *Kelly*'s third prong, but whether defendant objected on either of these grounds is not clear. Assuming for argument that he did and the issue was preserved for our review, we reject it. "The *Kelly* third-prong inquiry involves

48

further scrutiny of a methodology or technique that has already passed muster under the central first prong of the *Kelly* test, in that general acceptance of its validity by the relevant scientific community has been established. The issue of the inquiry is whether the procedures utilized in the case at hand complied with that technique. Proof of that compliance does not necessitate expert testimony anew from a member of the relevant scientific community directed at evaluating the technique's validity or acceptance in that community. *It does, however, require that the testifying expert understand the technique and its underlying theory, and be thoroughly familiar with the procedures that were in fact used in the case at bar to implement the technique.*" (*People v. Venegas*, *supra*, 18 Cal.4th at p. 81, italics added.) "Where the prosecution shows that the correct procedures were followed, criticisms of the techniques go to the weight of the evidence, not its admissibility." (*People v. Brown* (2001) 91 Cal.App.4th 623, 647.)

No real question exists that Dr. Blake was an expert in the field of DNA testing and that he fully understood the theory and procedures used to test the sperm samples for their genetic markers. Moreover, he was well aware that more than one man had produced the samples he tested, and his testimony regarding the procedures he used to analyze the samples, including the dot intensity analysis, explained why he paired certain alleles to others to conclude defendant's genotype was present in the samples. We thus reject defendant's argument that the DNA evidence failed *Kelly*'s third prong and conclude defendant's criticism of Dr. Blake's procedures go to the weight, not the admissibility, of that evidence.

To the extent defendant argues the DNA evidence was irrelevant because Dr. Blake's test results were as likely to exonerate as inculpate him, we reject the argument because the trial court did not abuse its broad discretion when it implicitly concluded Dr. Blake's evidence had a "tendency in reason to prove or

disprove [a] disputed fact that [was] of consequence to the determination of the action." (Evid. Code, § 210.) Defendant's further reliance on the reasoning in *People v. Pizarro*, *supra*, 110 Cal.App.4th 530, is unpersuasive; *Pizarro* was decided many years after the trial court's *Kelly* hearing in this case, and, in any event, that case involved a type of DNA testing (restriction fragment length polymorphism) different from the PCR testing used in this case.

### e. *Use of Population Frequency Data*

Defendant next argues the trial court erred in admitting Dr. Blake's testimony that he relied on population frequency statistics. Again citing *People v. Pizarro*, *supra*, 110 Cal.App.4th 530, defendant argues the proper scientific procedure where the perpetrator's race is unknown is to present the most conservative frequency statistic without mentioning any further refinement based on ethnic groups. Whether defendant objected on this ground and preserved the issue for appeal is unclear, but assuming for argument that he did, we reject the claim because this court disapproved *Pizarro* on this point in *People v. Wilson* (2006) 38 Cal.4th 1237. " 'Thus, there is no cogent reason to preclude testimony of a range of ethnic or racial genetic profile frequencies when the race of the perpetrator is unknown, so long as the data is not presented in a manner that assumes that the race of the perpetrator is the same as the race of the defendant. Since the testimony in the present case made no such assumptions, it was relevant, nonprejudicial, and properly received . . . .' " (*Wilson*, at p. 1250.)

### f. *Polymarker Evidence*

Defendant finally argues the trial court erred by admitting Dr. Blake's testimony on rebuttal regarding his conclusions from conducting the PCR polymarker analysis on the Carpenter and Sweets sperm samples because the witness failed to follow proper scientific procedures. According to defendant,

50

because no sensitivity dot (known as an "s" dot) appeared on the test strip for those samples, Dr. Blake should have aborted the test because "the manufacturer of the polymarker kit used by Dr. Blake[] recommends against typing a DNA sample unless the sensitivity dot is visible." Because Dr. Blake did not follow correct scientific procedures, defendant argues, his polymarker evidence on rebuttal failed *Kelly*'s third prong.

As previously noted, we agree with respondent that a challenge to the *Kelly* third prong goes to the weight, not the admissibility, of the evidence. (*People v. Brown*, *supra*, 91 Cal.App.4th at p. 647.) We thus reject at the outset any suggestion the trial court erred by admitting the evidence.

We also reject the argument that Dr. Blake's rebuttal evidence failed to satisfy *Kelly*'s third prong. Although defendant argues the kit's manufacturer recommends against using results when no sensitivity dot is visible on the test strip, his characterization of such user instructions is inaccurate. Dr. Blake read the manufacturer's directions into the record: " 'To read the developed amplitype PM DNA probe strip, begin by examining the "s" dot. It is recommended that a DNA probe strip with no visible "s" dot not be typed for any locus. . . . [¶] . . . [¶] However, individual laboratories may choose to type all loci for which a band was observed on the amplitype PM PCR product gel. Those dots that appear either darker than or equivalent to the "s" dot are . . . considered positive. . . . Dots that are lighter than the "s" dot should be interpreted with care.' " Thus, the manufacturer did not state categorically that the absence of a sensitivity dot rendered the resulting test strip unreliable.

Dr. Blake explained why he reported his results despite the absence of an "s" dot on some test strips: He ran two test strips on a reference sample of defendant's DNA; one had a visible "s" dot and one did not. Because the typing in both was identical (as they should have been, because they were both taken

from defendant), he felt confident in reporting results from the test. Similarly, Dr. Blake ran two polymarker tests on the sample from the Sweets case. One had a faint "s" dot and the other had no dot visible, but "the typing results from both specimens [were] identical," suggesting the absence of a visible sensitivity dot was of less importance.

In addition, defendant's experts did not categorically proclaim that a missing "s" dot rendered a polymarker test result invalid per se. When defense expert Marc Taylor was asked whether "genotype results can be interpreted on unknown samples where no 's' dot is visualized on the test strip?" he replied: "I think under certain circumstances that there are some interpretations that can be made. I think there are some very big dangers of misinterpretations when there isn't an 's' dot." And defense expert Patrick O'Donnell, when asked about a test strip with a missing "s" dot, responded: "I would attach . . . a very conservative interpretation to any sample in which an 's' dot was not visible," but later admitted there were other ways of compensating for the lack of a visible "s" dot.

Finally, any error with regard to the missing sensitivity dot was harmless under any standard. First, with regard to evidence implicating defendant in Trina Carpenter's killing, any error was harmless because the jury did not reach a verdict on that charge, and the People elected not to retry it. Second, with regard to evidence suggesting defendant killed JoAnn Sweets, the evidence against defendant was very strong even aside from Dr. Blake's PCR polymarker rebuttal testimony: Defendant's fingerprints were found on the plastic garbage bag in which Sweets's body was wrapped, she was found with a blanket made by defendant's mother, and carpet fibers on her body matched those in defendant's apartment.

In sum, we find the court did not prejudicially err in admitting the DNA evidence.

52

### 3. *Admission of Dr. Meloy's Testimony*

Defendant moved before trial for an evidentiary hearing to discover the nature of the testimony the prosecution intended to present from witness Dr. John Reid Meloy. The trial court held an Evidence Code section 402 hearing at which Dr. Meloy testified and described the basis of his expertise and the nature of his expected testimony. At the end of the hearing, the trial court ruled Dr. Meloy could testify as an expert on sexual homicides but could not express the opinion that defendant himself fell into the category of a being a perpetrator of sexual homicides. The court also emphasized its ruling was a tentative one. When defendant later formally moved to exclude Dr. Meloy's testimony, the court affirmed its earlier tentative ruling, noting the witness's testimony would be limited to "intent and motive at the time [of the crime]." In other words, the court allowed the witness to testify and "to dispel . . . what may be misperceptions by the jury that nobody would kill for sex when you have got a prostitute there."

The court revisited its tentative ruling twice more, each time reaffirming its previous ruling, noting the ruling's limits and affirming that it would exclude all other parts of Dr. Meloy's anticipated evidence under Evidence Code section 352.

In light of the limits the court placed on Dr. Meloy's trial testimony, it was brief, spanning only 16 pages in the trial transcript. He explained that he was a forensic psychologist and, on a parttime basis, the chief of court services for the San Diego County forensic mental health division. In the latter capacity, he was, among other things, "administratively responsible for the outpatient psychiatric treatment program for individuals that have been found not guilty by reason of insanity, have then gone to the state hospital, usually for a number of years, and then are released by the court back to the community." In addition to having received a number of degrees, Dr. Meloy also was board certified as a forensic psychologist and had worked in the criminal law field for many years. He had

particular experience studying the field of "sexual homicide," which he defined as " 'the intentional killing of another human being during which there is evidence of sexual activity by the perpetrator.' " He had conducted research and published papers on that subject and had been retained as an expert in numerous criminal cases.

Asked by the prosecutor how sexual homicide differs from more common homicide, Dr. Meloy explained: "Generally in most homicides there is not any sexual arousal involved. Generally most people who kill somebody else intentionally, it is usually somebody they know; actually, quite well. And they are usually very frightened or very angry when they do it, and there is no sexual component to it at all." Asked whether "a motivation or desire [or] intent . . . drives" the perpetrator of a sexual homicide, Dr. Meloy replied: "The intent in sexual homicide, and the reason that sexual homicides exist, is that the person who does this, his rage toward women, his violence toward women, and the woman's suffering under his domination is his biggest sexual turn-on"; that is, the perpetrator of such a crime "is sexually aroused by the act of violence toward the victim, who is usually a woman, and he [will desire to reach a sexual climax] before, during, or after the killing." On cross-examination by defense counsel, Dr. Meloy affirmed that his definition sexual homicide "is not a legal definition of any kind" and that it is not included in any diagnostic literature such as the "DSM-III."[16]

---

[16] Known by the acronym "DSM," the "Diagnostic and Statistical Manual of Mental Disorders [is published] by the American Psychiatric Association. 'The DSM–IV is recognized by the courts as a standard reference work containing a comprehensive classification and terminology of mental disorders.' " (*People v. Mills*, *supra*, 48 Cal.4th at p. 205, fn. 17.)

Defendant raises a number of arguments challenging the admission of Dr. Meloy's testimony.

### a. Bledsoe

Defendant first contends, as he did below, that admission of Dr. Meloy's testimony was contrary to the principles set forth in *People v. Bledsoe* (1984) 36 Cal.3d 236. *Bledsoe* addressed the admissibility of expert evidence describing rape trauma syndrome. Such psychological evidence, we recognized, may explain why some rape victims delay reporting the crime, or even recant an accusation, and thus "may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id*., at pp. 247-248.) In *Bledsoe*, however, "the evidence was not admitted for any such purpose" (*id*., at p. 248), as the victim in the case reported the crime immediately and never wavered in her story, nor did the defendant argue the victim's postcrime behavior indicated she had not been raped. Under those circumstances, we concluded that "expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped." (*Id.*, at p. 251.)

In denying defendant's motion to exclude Dr. Meloy's testimony in the instant case, the trial court explained: "[W]hen considering Bledsoe, the relevance of [Dr. Meloy's] testimony is not to prove that a sexual homicide did or did not occur here, nor to prove that the defendant committed any of these crimes. . . . [¶] His testimony is simply to give the jury insight into the motive and intent that may go behind a sexual homicide, and such testimony is highly relevant where lay persons will probably find it incomprehensible why a prostitute would be murdered for sex when the sex could be obtained voluntarily." The court later reiterated the limits of its ruling, saying: "Dr. Meloy's testimony would be limited

55

to just that portion that would dispel any confusion on the jury's part concerning the intent of somebody where there is the killing of a willing prostitute for sex. So I think the people are entitled to dispel that confusion, and the rest of it would be out under [Evidence Code section] 352 or lack of foundation."

Although the court did not admit Dr. Meloy's testimony as evidence defendant committed the charged crimes, defendant nevertheless contends the rule permitting admission of such psychological evidence is inapplicable here. He argues the prosecution presented no evidence of a commonly held misconception that Dr. Meloy's evidence might serve to contradict. But Dr. Meloy testified extensively at the Evidence Code section 402 hearing about what his research into the area showed, and it was reasonable for the trial court to find that jurors might not understand why a person would kill a consensual sexual partner. Dr. Meloy's description of the unusual psychological urges of those who commit sexual homicides was thus relevant to the jury's proper assessment of the evidence. "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citations], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) Applying that standard here, we find no abuse of discretion.

Defendant raises a number of subsidiary claims. Assuming for argument he properly preserved them below, we similarly find them nonmeritorious. Defendant first contends that because Dr. Meloy and the trial court agreed that sexual homicides were rare, there could be no *commonly* held misconception about such killings or the murders in this case. This was a matter for the trial court to weigh in exercising its discretion and we perceive no abuse of discretion in that regard. Second, defendant observes the jury questionnaire included questions concerning protection of prostitutes, and whether they can be victims of rape, and

56

the jurors' answers to these questions showed they harbored no such misconceptions about prostitutes. But Dr. Meloy testified that some persons appear to suffer from a mental disorder that leads them to kill willing sexual partners in order to experience heightened sexual pleasure. The jury questionnaire did not give the jurors this information.

Third, defendant argues Dr. Meloy's evidence was not targeted to refuting the specific misconception that people do not kill willing sexual partners to achieve increased sexual pleasure. He contends, for example, that none of the studies on which Dr. Meloy relied involved victims who were prostitutes. The trial court reasonably considered the issue in more general terms: the killing of any willing sexual partners, not simply prostitutes. Fourth, defendant argues Dr. Meloy's evidence was inadmissible because the defense introduced no contrary evidence to be refuted; that is, defendant never claimed that willing sexual partners were never killed for psychological reasons. But the court did not admit Dr. Meloy's testimony because defendant had somehow opened the door to it by his own evidence. (See, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 74 [defendant's testimony opened the door to questioning about other crimes].) Nor was Dr. Meloy's testimony tantamount to rebuttal evidence, which is subject to certain restrictions. (See *People v. Young* (2005) 34 Cal.4th 1149, 1199 [rebuttal evidence " 'is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt' "].) Instead, the court admitted the evidence because it was "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) We thus reject these subsidiary claims.

### b. Relevance, Evidence Code Section 352, and Due Process

Defendant next contends Dr. Meloy's testimony should have been excluded because it was irrelevant and violative of both Evidence Code section 352 and his right to state and federal due process of law. Of course, only relevant evidence is admissible (Evid. Code, § 350), and relevance is defined as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (*id*., § 210). The trial court has broad discretion to determine the relevance of evidence (*People v. Gurule* (2002) 28 Cal.4th 557, 614), and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125).

As he did in the trial court, defendant argues Dr. Meloy's evidence was so speculative that it was irrelevant. " 'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' [Citations.]" (*People v. Bivert*, *supra*, 52 Cal.4th at pp. 116-117.) Here the trial court admitted the evidence to show motive. As the court explained, Dr. Meloy's "testimony would be offered to provide insight into the motive or intent involved in the perpetration of the sexual homicide," likening it to another case in which an expert was allowed to give evidence on Munchausen's syndrome by proxy. (*People v. Phillips* (1981) 122 Cal.App.3d 69, 78-79.)

The record shows the trial court carefully, even meticulously, considered the proper limits on Dr. Meloy's anticipated testimony. Under the circumstances, we find no abuse of discretion. Although defendant attacks Dr. Meloy's evidence because it was based on a small sample, incorporated the use of Rorschach inkblot testing, and used surveys that included offenders who did not kill prostitutes, such alleged discrepancies do not demonstrate Dr. Meloy's testimony was so

58

speculative as to render it inadmissible. (See *People v. Horning* (2004) 34 Cal.4th 871, 900-901 [inability of expert to say bullets were unquestionably fired from a particular gun did not render evidence inadmissibly speculative].) To the extent defendant argues Dr. Meloy's testimony was inadmissible because defendant's intent and motive were not in dispute, we reject that claim as well. " 'Motive is not a matter whose existence the People must prove or whose nonexistence the defense must establish. [Citation.] Nonetheless, "[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence." ' " (*People v. Roldan*, *supra*, 35 Cal.4th at p. 707.) Finally, we reject defendant's argument that Dr. Meloy expressed an opinion on the ultimate fact of defendant's state of mind in violation of section 29.[17] The witness offered no such opinion; he merely agreed that in a sexual homicide, the perpetrator's motivation, desire or intent "drives" the activity, and that "[t]he intent in sexual homicide, and the reason that sexual homicides exist, is that the person who does this, his rage toward women, his violence toward women, and the woman's suffering under his domination is his biggest sexual turn-on." The jury was left to decide whether defendant had committed a sexual homicide and so had acted with that intent.

Defendant also reprises his pretrial claim that the court abused its discretion in denying his motion to exclude Dr. Meloy's testimony as being more prejudicial than probative. (Evid. Code, § 352.) ". . . Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed

---

[17]    "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29.)

by its prejudicial effect. 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) The trial court was well aware of the danger Dr. Meloy's evidence posed and therefore limited the scope of his testimony severely. The trial court has broad discretion under Evidence Code section 352 to exclude evidence (*People v. Mills*, *supra*, 48 Cal.4th at p. 195), and we cannot say it abused its discretion in this case. Nor did defendant suffer any prejudice; although he contends Dr. Meloy's testimony must have created a "deep loathing" for him and instilled "an emotional bias" against him, the facts are otherwise. By failing to come to a verdict on two of the four alleged murders, the jury showed it had considered each count separately and thoughtfully and was not overcome by bias against, or hatred for, defendant.

Many of these same considerations lead us to reject defendant's claim that his right to due process under the state and federal Constitutions was violated by the admission of Dr. Meloy's testimony, which rendered his trial fundamentally unfair. "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 913.) The trial court's careful pruning of Dr. Meloy's anticipated evidence and the ultimate brevity of his testimony underscore the fairness of the process, and defendant's ability to call witnesses to impeach Dr. Meloy, as well as the jury's inability to return verdicts on two of the four charged murders, demonstrate the trial was not fundamentally unfair.

### c. Evidence Code Section 720

One of the grounds on which defendant relied for his pretrial motion to exclude Dr. Meloy's testimony was that the witness was not qualified under

60

Evidence Code section 720 to testify as an expert regarding sexual homicide. On appeal, defendant has reframed his argument: he contends Dr. Meloy's testimony was inadmissible because no such subfield of psychology known as "sexual homicide" exists, "or at the very least, the prosecution failed to show its existence." Although respondent argues defendant failed to preserve this precise claim by raising it in this form below, we take defendant's consistent reliance on Evidence Code section 720 to mean he contends the prosecution failed to show Dr. Meloy "has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) As so construed, we reject it.

A trial court's decision that a proposed witness qualifies as an expert under Evidence Code section 720 is a matter within the court's broad discretion and will not be disturbed on appeal unless the defendant demonstrates a manifest abuse of that discretion. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1336.) When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony. (*People v. Eubanks* (2011) 53 Cal.4th 110, 140.) Here, an extensive hearing pursuant to Evidence Code section 402 was held before trial in which Dr. Meloy related his educational history, his study of the subject of sexual homicide, his personal interviews and observations of subjects, his published papers, and his conclusions regarding sexual homicide. At trial, he candidly admitted on cross-examination that the definition he was using of sexual homicide was not contained in the DSM. Defendant was free to call his own witness to dispute Dr. Meloy's conclusions, but the trial court's decision to permit Dr. Meloy to testify as an expert was well within its discretion.

61

### d. Evidence Code Section 801

As he did before trial, defendant contends Dr. Meloy's testimony regarding sexual homicides amounted to a legal conclusion in violation of Evidence Code section 801, subdivision (a). Although that provision permits an expert to "assist the trier of fact" by testifying to any subject "that is sufficiently beyond common experience," such testimony is limited in an important way. "[Although] opinion evidence which is otherwise admissible is not made inadmissible simply because it embraces the ultimate issue to be decided by the trier of fact . . . [t]he cited rule does not . . . authorize an 'expert' to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence." (*Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841, cited with approval in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884; see 1 Witkin, Cal. Evidence (5th ed. 2012) Opinion Evidence, § 98, pp. 745-748.)

Contrary to defendant's argument, Dr. Meloy's testimony at trial did not run afoul of this rule. The witness neither provided a legal conclusion nor defined a crime for the jury. He merely described the phenomenon, noted by other experts, called "sexual homicide." He did not offer a legal conclusion that all sexual homicides are intentional and purposeful, nor did he say that such crimes were tantamount to deliberate and premeditated murder. Although Dr. Meloy agreed with the prosecutor that sexual homicides involve "goal-oriented behavior," he did not go further to say that the goal of the perpetrators of such homicides was always to kill. In any event, defendant did not object to this testimony and he thus forfeited the issue.

Defendant also contends Dr. Meloy's testimony contravened subdivision (b) of Evidence Code section 801. That provision states in pertinent part: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter . . . that is of a type that

62

reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." We addressed that subject in *People v. Gardeley* (1996) 14 Cal.4th 605, where we explained that expert testimony can be based on a wide variety of information so long as it is reliable. "For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' " (*Id*., at p. 618.) A trial court enjoys broad discretion when ruling on foundational matters such as qualifying a witness under Evidence Code section 801, subdivision (b), and such decisions will not be disturbed on appeal absent a showing of a manifest abuse of discretion. (*People v. Mickey* (1991) 54 Cal.3d 612, 688.)

Although an expert witness's opinion may not be based on guess or conjecture (*People v. Moore* (2011) 51 Cal.4th 386, 405), such was not the case here. In the foundational hearing held before trial, Dr. Meloy carefully described his 18 years of experience with sexual homicides, his research, his methodology, the publications he had read, and the cases involving sexual homicide in which he had been a consultant. Defendant criticizes this foundation of Dr. Meloy's opinions as unreliable within the meaning of Evidence Code section 801, subdivision (b), arguing that his opinions were self-contradictory and tentative, that the methodology of using Rorschach inkblot tests had not been peer reviewed, that other cases in the literature had not involved prostitutes as victims, that Dr. Meloy had not personally interviewed other perpetrators of sexual homicide and asked them about their motives, and that his definition of sexual homicide was "unworkable and unreliable." On this record, however, we cannot say the trial court abused its broad discretion in finding Dr. Meloy was qualified as an expert under the Evidence Code, especially as the court carefully limited the scope of Dr. Meloy's testimony to describing the phenomenon of sexual homicide without

63

tying it specifically to defendant.  Defendant was free to try to impeach Dr. Meloy by calling his own expert witness to make these points.

### e.  Evidence Code Section 1101

Defendant also argues Dr. Meloy's testimony constituted impermissible character evidence that the court should have excluded pursuant to Evidence Code section 1101.  As respondent observes, however, defendant never moved to exclude the evidence under that section and has thus forfeited the claim for appeal.  Defendant responds that because the trial court made comments suggesting it was aware that Dr. Meloy's anticipated testimony could potentially transgress the rule against bad-character evidence, we should find the issue was before the court— and therefore preserved for appeal—despite his failure to object.  We decline his invitation because the purpose of the rule requiring a timely and specific objection is not only " 'to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, [but also] *to afford the People an opportunity to establish its admissibility*.' " (*People v. Partida* (2005) 37 Cal.4th 428, 435, italics added.)  Although the trial court may have made some comments about character evidence, defendant never placed the prosecution on notice that it needed to justify the admissibility of Dr. Meloy's evidence under Evidence Code section 1101.  Accordingly, he did not preserve the claim for appeal.

Were we to address the merits of the claim despite the absence of an objection below, we would find no error and no prejudice.  Under Evidence Code section 1101, subdivision (b), evidence of a person's prior bad act—evidence that might incidentally tend to show the person's disposition to commit such an act—is nevertheless admissible, if relevant, to raise an inference of (and hence prove) his motive or intent when he committed his crimes.  So even assuming for argument that defendant is correct in his characterization of Dr. Meloy's testimony as

64

showing defendant's bad character, it could still be admissible to show defendant's motive. In any event, Dr. Meloy never connected defendant to his psychological theory; that is, he never testified that defendant was in fact a perpetrator of sexual homicide. Accordingly, because Dr. Meloy did not testify to or describe defendant's past bad acts, Evidence Code section 1101 is simply inapposite.

### f. Kelly

Defendant next contends the trial court erred by admitting Dr. Meloy's testimony without first assessing the reliability of his methodology under the *Kelly* rule. (*People v. Kelly*, *supra*, 17 Cal.3d 24.) As noted, *ante*, at pages 41-42, *Kelly* directs that the proponent of expert testimony based on a new scientific technique or procedure demonstrate both the new technique's reliability and that the witness is qualified to give an opinion on the subject. Caution with evidence involving new scientific techniques is justified because "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' [Citations.]" (*People v. Kelly*, *supra*, at pp. 31-32.)

No such concerns are present in this case. Like the proposed expert evidence regarding the psychological factors that might affect the accuracy of eyewitness identifications at issue in *People v. McDonald* (1984) 37 Cal.3d 351, or the proposed expert evidence (that the defendant's psychological test results did not suggest sexual deviancy) at issue in *People v. Stoll*, *supra*, 49 Cal.3d 1136, the evidence here was not a new scientific technique or procedure but merely expert opinion evidence. "It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their

65

acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative." (*McDonald*, *supra*, at pp. 372-373.)

"[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*[]." (*People v. Stoll*, *supra*, 49 Cal.3d at p. 1157.) " 'We have never applied the *Kelly*[] rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, *or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association.*' " (*Stoll*, *supra*, at p. 1157, quoting *People v. McDonald*, *supra*, 37 Cal.3d at p. 373, italics added.) Our conclusion in *Stoll* applies fully to this case: "The psychological testimony proffered here raises none of the concerns addressed by *Kelly*[]. The methods employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility." (*Stoll*, *supra*, at p. 1157.)

Defendant's attempt to distinguish *Stoll* and *McDonald* is unpersuasive. He primarily argues that prior cases such as *People v. Coogler* (1969) 71 Cal.2d 153, that permitted an expert witness's reliance on Rorschach test results, also involved other factors as well, such as results from the Minnesota Multiphasic Personality Inventory. (*Id.*, at p. 165.) But without passing on whether an expert opinion based solely on Rorschach tests would be inadmissible under *Kelly*, we note that Dr. Meloy's opinions were based not only on Rorschach test results, but also on his broad knowledge and experience with the subject matter in question. Such

66

knowledge came from his familiarity with research and published studies in the area of sexual homicide, his treatment of a patient in Chicago, his employment as an expert evaluating criminal defendants charged with sex-related homicides, his own research, which included personally interviewing subjects, his cooperation with an individual who worked with the Federal Bureau of Investigation in establishing a training seminar on the subject, his participation in lectures and workshops around the country on the subject, and his publication of nine papers and parts of two books dedicated to the subject.

To the extent defendant challenges Dr. Meloy's qualifications on the grounds that he was not an impartial witness, or that he did not personally interview all 18 subjects in one study, we reiterate that the trial court did not abuse its discretion in finding he qualified as an expert under the Evidence Code. Accordingly, the matters raised go simply to the weight, not the admissibility of Dr. Meloy's testimony. We further reject defendant's claim that Dr. Meloy's testimony "blindside[d] the jury" within the meaning of *People v. Stoll*, *supra*, 49 Cal.3d at page 1157. After the lengthy Evidence Code section 402 hearing, Dr. Meloy's actual testimony before the jury was surprisingly short: after he explained his background and experience, his description of sexual homicides comprises barely five pages in the trial transcript. As a result, it likely had little impact with the jury.

### 4. *Exclusion of Maria R.'s Alleged Apology*

Defendant contends the trial court abused its discretion, and also committed federal constitutional error, by excluding evidence that sometime after defendant assaulted Maria R., she returned to the apartment on 51st Street to apologize for falsely accusing him. We reject the claim because defendant fails to demonstrate

67

the trial court abused its broad discretion when it determined that he failed to lay a proper foundation for this proposed evidence.

Maria R. testified that after she was assaulted, she met some people from a church and told them she was afraid defendant might harm her again. She then returned to the Jones apartment with some of these people but stayed in the car while they went to speak with defendant at the apartment. When defense counsel asked the witness what these people told defendant, the prosecutor successfully interposed a hearsay objection, although the court allowed defense counsel to ask her if she knew what was said. She replied, "No, only what they told me."

Later in the trial, the defense called defendant's mother, Ann Jones (Jones), to the stand. While questioning Jones, defense counsel asked her whether, in August 1985, someone came to her door. She replied that a Hispanic man and a woman came to her door, that the man identified himself as a preacher of a church the witness did not recognize, and that he translated for the woman, who spoke Spanish only. When the witness began recounting what the Hispanic man and woman said, the prosecutor objected on hearsay grounds, arguing the defense had not laid a foundation as to the identity of the two persons who came to Jones's apartment. At a sidebar conference, defense counsel argued the Hispanic woman whom Jones saw on her doorstep was in fact Maria R., although counsel admitted that when shown a photo of Maria R., Jones did not identify her but merely noted that she remembered the woman as thinner. The trial court suggested that because Maria R. testified in English but Jones said the woman spoke Spanish only and needed the preacher to translate, perhaps there was "an identification problem." Defense counsel speculated that because nine years had elapsed between the assault and the trial, Maria R.'s English proficiency might have improved. Counsel admitted that, despite some effort, the defense had not been able to locate the man Jones described as a preacher.

68

The court tentatively found the doubts about the evidence went to its weight, not its admissibility, and was of a mind to admit it, but defense counsel, apparently for tactical reasons, asked for a hearing out of the jury's presence to establish the foundation for the evidence, "because if there is not enough, I don't want to set up a situation where [the jury] really consider[s] it a straw man type of situation. I [would] just as soon have it out." The court obliged and held a hearing out of the jury's presence to determine whether a foundation existed for the proposition that Maria R. spoke to Jones and apologized for claiming that defendant had assaulted her. Jones testified at the hearing that the Spanish-speaking woman, as interpreted by the preacher, told her that "[s]he's here to say she's sorry. And I said 'sorry about what?' And he said she was upset. She had been beaten up by her husband. She didn't know why she did this. She didn't know why she did that. And she was just confused. [¶] And I said—by that time I think I called [defendant], you know, called him out because I think he was in the back and he came to the door. [¶] And basically this woman was, you know, talking very quickly and the man would translate and she would talk, and she was just—and I am like 'you're sorry about what? What happened? What happened?' And then I asked my son and he said, 'well, I gave her some food, you know. I tried to help her out.' " Jones said she had never seen the Hispanic woman before and denied the police had ever shown her pictures of her.

On the foundational question of the mystery woman's identity, Jones testified that she had attended the first day of trial and observed Maria R. testify. Asked whether she recognized her at that time, Jones replied: "*No. I thought she looked kind of heavy, to me. About the same height, but then I am tall. So she didn't seem very tall to me, but she looked kind of chunky or—but then it was at night. I don't—you know, it was kind of hard to say*." (Italics added.) Later, she was asked: "Did you recognize her from having been one of the people at your

door other than the difference in weight?"  She replied:  "The only thing I can say is I thought *maybe* that was her."  (Italics added.)  On cross-examination by the prosecutor, Jones could not identify the month, day or even year when the alleged encounter occurred.  On redirect, defense counsel asked her whether there was "anything else about the woman you saw testify that caused you to believe it was [Maria R.]?"  She replied:  "When she walked in, when I turned my head and I saw her, and I thought, gee, she's gained a lot of weight.  I still don't know why I said that, but I just—you know, I just felt like I knew her.  *From where I don't know*."  (Italics added.)  Following this testimony, the trial court sustained the prosecutor's hearsay objection for lack of foundation.

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing . . . ."  (Evid. Code, § 1235.)  Had there been evidence from which a reasonable jury could have concluded the Hispanic woman who came to Ann Jones's home was Maria R., then the alleged apology could be considered a statement that was inconsistent with her accusations of assault and thus admissible under Evidence Code section 1235.  But a trial court's decision to admit or exclude a hearsay statement under this hearsay exception will not be disturbed on appeal absent a showing of abuse of discretion.  (*People v. Cowan*, *supra*, 50 Cal.4th at p. 462.)  When the admissibility of evidence turns on the existence of a preliminary fact (see Evid. Code, § 403), the trial court may, as here, hold a hearing outside the jury's presence to determine whether that preliminary fact exists.  "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.'  [Citations.]  The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion."  (*People v. Lucas* (1995) 12 Cal.4th 415, 466.)

70

Because Jones could not say the Hispanic woman was in fact Maria R., there is no reason to think the speaker's statements were a prior statement of Maria R., inconsistent or otherwise. Defendant contends he presented sufficient evidence from which a reasonable jury could have found Maria R. was the Hispanic woman who accompanied the preacher to Jones's home, observing that " 'the judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. The "question of admissibility . . . merges imperceptibly into the weight of the evidence, if admitted." ' " (Quoting Legis. Com. com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 403, p. 361, quoted with approval in *People v. Lucas*, *supra*, 12 Cal.4th at p. 467.) The flaw in this argument is that defendant never presented sufficient evidence to allow the jury to find that the woman who came to Jones's home was in fact Maria R. The victim testified that she went to the home with some "church people" she met, that "some church lady" went to the house, but that she (Maria) stayed in the car. Jones did not contradict this testimony, admitting that she did not recognize Maria R. when she testified at trial, and that she knew her from somewhere but could not say where. Jones testified that "maybe" the woman was Maria R. Defense counsel acknowledged that Jones did not identify Maria R. when shown her photograph, and that the preacher could not be located for corroboration. Under the circumstances, the trial court did not abuse its broad discretion by excluding the evidence because defendant failed to present evidence that, if believed by the jury, would have shown it was Maria R. who came to speak to defendant at Jones's home.

Defendant further argues the evidence of the alleged apology for a false accusation was admissible because the unidentified "church people" were acting as a Maria R.'s agents. This claim fails because no evidence establishes such agency. Maria R. testified she told the "church people" that she was afraid

71

defendant would hurt her again, so one may infer they went to warn defendant not to do so. Maria R. never said she asked them to apologize for a false accusation. Indeed, she disclaimed any knowledge of what these people told Jones and defendant until they returned and related to her what they said.

There being no abuse of discretion in excluding the evidence under Evidence Code section 1235, we also reject defendant's additional claim that the trial court's ruling deprived him of his federal constitutional right to present a defense. (See, e.g., *Crane v. Kentucky* (1986) 476 U.S. 683.) As we have explained, the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights. (*People v. Mills*, *supra*, 48 Cal.4th at p. 194.) Instead, because the trial court merely excluded some evidence that could have impeached a complaining witness and did not preclude defendant from presenting a defense, any error would be one of state evidentiary law only. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)

### 5. *Admission of Expert Fingerprint Evidence*

Defendant next argues the trial court erred by permitting an expert to testify that she used a vacuum metal deposition device in Ottawa, Canada, assisted by the Royal Canadian Mounted Police, to discover and preserve fingerprints on the plastic garbage bags in which JoAnn Sweets's body was found. After a hearing, the trial court overruled defendant's objection for lack of foundation and admitted the evidence. As we explain, the trial court did not abuse its discretion.

Dianne Donnelly testified that at the time of defendant's trial, she worked for the San Diego Police Department as a latent fingerprint examiner. She was asked in 1992 to determine if there were any identifiable fingerprints on the plastic trash bags in which police found JoAnn Sweets's body. Although Sweets's body was found in 1986, the plastic bags had not yet been processed for prints.

Donnelly testified she carefully transported the bags to Ottawa, Canada, because it was determined that the best way to process old fingerprints on plastic bags was by the vacuum metal deposition method and the United States did not have the machinery necessary to conduct the procedure. "The Royal Canadian Police generously assisted us in allowing me to come up and learn about this method and to try to obtain prints from these bags." When Donnelly began describing the process, defense counsel objected on the ground that the witness was testifying "outside of her expertise." After discussing the matter at sidebar, the trial court provisionally overruled the defense objections, provided the prosecutor would lay a proper foundation "as to what training she had . . . in this machinery."[18] It was acknowledged the evidence would be subject to a continuing objection by the defense.

Donnelly admitted she was not familiar with the vacuum metal deposition process "since we don't have a chamber here in San Diego or in the U.S.," but that she learned the process from two Canadians when she arrived there. Once in Canada, she familiarized herself with the process, doing "several trial runs" so that she could "observe it and learn the process." She had done a lot of background reading about the process before going to Canada and later wrote and presented a

---

[18]    The trial court told the parties: "I think that [Donnelly] should talk about the kinds of literature that she read about it, go a little more deeply into exactly what it was that she read, what she observed, the whole process, how the thing was preserved when she went up [to Canada]." Later, it opined: "Here's what I require. The foundation—the objection is foundation, and it seems to me that the foundation is lacking and the thoroughness with which she is describing her knowledge of the machinery and how it works exactly and exactly how the bags were treated while they were in her custody and what was done with them. [¶] So those are the two areas I ask you to cover is all. I think that that will do it. And other issues might require other witnesses."

paper to the California division of the International Association for Identification on her experiences using the Canadian device.

Donnelly then testified to the condition of the plastic bags and the precautions she took to preserve them from contamination or alteration. She said the process was first developed in the United Kingdom in 1976, but technicians in other countries, such as Canada, also use it. As to why her office chose that method, she explained that "[v]acuum metal deposition's strength[] is in the detection of older prints, which in this case is what we had. We knew that the print had to be at least six years old. From the time of the occurrence of the death to the time that I came in custody of these bags there was a six year difference, and this—the strength of vacuum metal is also on these polyethylene type bags. [¶] It can't be used—this type of process on every type of evidence. This is its strength: plastic bags and on older prints. That's why we chose it."

The process, which she personally observed, involved placing the bag in a chamber and subjecting it to vaporized zinc and gold. Those metals are absorbed by the fats and lipids in any existing prints on the bag and settle into the valleys between the ridges of the print. The process does not add fingerprints not already present on the tested material, nor remove or alter prints already deposited.[19] Fingerprints made visible by the process are then photographed to preserve them and are compared to fingerprints on file. Donnelly matched the fingerprints found on the bag to those of defendant on file with the San Diego police.

---

[19]    As the trial court commented: "Nobody would even think in their wildest imagination that if you put something into a machine that it's going to put prints on it. So you probably don't have to know what the intricacies are of what happens inside the machine. The questions are whether it goes in and comes out with something showing."

On cross-examination, Donnelly testified that she did not attempt to process the bags before going to Canada and was not aware that anyone else had either. Had someone done so, the bags would have been contaminated and the vacuum metal deposition process would not have worked. Had the bags not been so old, she would have processed them in a cyanoacrelate fuming chamber using superglue fumes, stained them with a florescent dye and then used a laser to examine the florescence. Asked whether she was "aware of how the process actually worked," she replied, "[n]ot all the functions of the machine, no. I was just aware of how the latent print reaction would work, that general process. As far as how all the machinery works, I really don't care. As long as it develops the latent prints on my evidence, that's what I care about." Asked whether she made "any kind of investigation regarding whether the machine was working properly," she said she did "only what [the Canadian authorities] did. I mean, the system is very idiot proof, if I can use that term. It will stop a procedure or it won't let you continue if there is something wrong."

In further describing the process, Donnelly said the reason they had to do so many applications—14 in all—was because the bag was so large, and the zinc and gold evaporation dishes would only work on a small area. She revealed that the fingerprints she found were all on the outside of the bag.

As noted, *ante*, part I.C.3.c., a trial court has broad discretion to find a proposed witness qualifies as an expert under Evidence Code section 720 and that decision will not be disturbed on appeal absent a showing of manifest abuse of that discretion. (*People v. Castaneda*, *supra*, 51 Cal.4th at p. 1336.) Defendant cites *People v. Williams* (2002) 28 Cal.4th 408, 412, and *Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 140, to argue the prosecution failed to establish a foundation for Donnelly's testimony by showing that "(1) the testing device was in proper working order, (2) the test was properly administered, and

75

(3) the operator was competent and qualified." (*Williams*, at p. 412.) Respondent counterargues that those cases "and the three-step test are inapposite because they specifically involve blood-alcohol testing devices (*Davenport*) and preliminary alcohol screening (PAS) testing devices requiring compliance with Title 17 of the California Code of Regulations (*Williams*)." Respondent further argues that no authority exists applying this three-step analysis to fingerprint analysis.

We need not resolve the point because the record demonstrates the trial court did not abuse its broad discretion. Although Donnelly arguably did not demonstrate she was a renowned expert in the workings of the vacuum metal deposition device, she expressed sufficient expertise—reading "books from different authors" about the process, being trained by Canadian law enforcement officials, undertaking several trial runs—to adequately support the trial court's conclusion that she demonstrated "special knowledge, skill, experience, training, or education sufficient to qualify [her] as an expert on the subject to which [her] testimony relates." (Evid. Code, § 720.)

There being sufficient evidence to conclude the trial court did not abuse its broad discretion in finding Donnelly's testimony was not outside of her expertise within the meaning of Evidence Code section 720, questions about the depth or scope of her knowledge or experience go to the weight, not the admissibility, of her testimony. (*People v. Eubanks*, *supra*, 53 Cal.4th at p. 140.)

### 8. *Alleged Insufficient Evidence*

Defendant contends the evidence underlying his murder convictions and the sodomy-murder special-circumstance allegations was insufficient, requiring we reverse those convictions and findings and vacate the imposition of the death penalty. "The law is clear and well settled. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it

76

discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)' " (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

As defendant emphasizes, little or no direct evidence connects him to some of the crimes; the prosecution instead relied on circumstantial evidence. But " '[t]he standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.] " 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " ' [Citation.]" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 504.)

### a. JoAnn Sweets

Ample evidence supports defendant's conviction for murdering JoAnn Sweets. Her partially nude body was found in a dumpster on May 9, 1986, placing the crime within the timeframe in which someone was preying on African-American women—often prostitutes, but also other poor denizens of the street, such as homeless women and drug addicts—in and around El Cajon Boulevard in

77

San Diego.[20]  The dumpster was just behind defendant's apartment on 51st street in San Diego.  Like the other victims, Sweets had been beaten and manually strangled.  Her body was partially wrapped in a bed sheet and covered with a colorful, homemade afghan blanket, placed in plastic garbage bags that were taped shut with masking tape, and deposited in a dumpster.  Defendant's sister, L.A., admitted she "might have" told police she was "100 percent sure" her mother had crocheted the afghan, although she backtracked somewhat at trial.  Using the vacuum metal deposition technique, police found defendant's fingerprints on the plastic garbage bags.  Further forensic investigation found fibers on the victim's blouse that matched the carpet in defendant's apartment.  Semen stains on the bed sheet were consistent with defendant's genetic profile, although a DNA analysis could not positively identify defendant as the donor to the exclusion of all others.

Defendant suggests problems with this evidence:  L.A.'s hesitant and equivocal testimony about the afghan, alleged unreliability of the testing of the plastic bags for fingerprints, the possibility the carpet fibers were fairly common and not unique to defendant's apartment, failure to show the semen stains could have been only from defendant.  The whole of the evidence nevertheless comprises solid and substantial circumstantial evidence which, when combined with the other evidence of similar crimes that occurred within the relevant timeframe, including three in which the victims survived and identified defendant as their assailant (Maria R., Bertha R., Karen M.), could have persuaded a reasonable jury beyond a reasonable doubt that defendant was guilty of murdering JoAnn Sweets on either a premeditation or a felony-murder theory.  Significantly, although defendant presented evidence suggesting Ike Jones, Sweets's one-time

---

[20]    The timeframe is relevant.  See *ante*, page 27, footnote 6.

boyfriend, may have been the killer, genetic testing eliminated him as a donor of the semen stain.

Defendant further argues the evidence was insufficient to sustain the special circumstance that he killed Sweets while committing the crime of forcible sodomy. A rectal swab taken from Sweets's body revealed the presence of sperm, but not enough on which to conduct a DNA test. From this evidence, the manner of Sweets's violent murder, the location of her body, and the evidence of defendant's intent and modus operandi as shown by his similar crimes, the jury reasonably could have found defendant forcibly sodomized Sweets before killing her.

### b. Sophia Glover

We also reject defendant's claim that insufficient evidence supported his conviction for the crimes against Sophia Glover. Although the evidence of defendant's guilt of murdering Glover was less than the evidence of Sweets's murder (there being no fingerprints, blanket, or carpet fibers linking the body to defendant), Glover fit the profile of defendant's victims: she was an African-American woman, she was likely a prostitute, she was killed during the 14-month period defendant was known to be preying on such women, she had been beaten about the head, she died of manual strangulation, and her body was discarded like garbage in close proximity to a home defendant was known to use. An analysis of an anal swab found sperm consistent with defendant's genotype, which appeared in approximately 15 percent of the African-American population.

Defendant challenges the force of this evidence, emphasizing the presence of another man's sperm in the swab sample. He also notes that although police found three hairs on the blanket in which Glover's body was wrapped, experts could not match them to him. Despite these circumstances, a reasonable jury

79

considering all the evidence, including the evidence of other similar crimes that occurred within the relevant timeframe in three of which the victims survived and identified defendant (Maria R., Bertha R., Karen M.), could have found beyond a reasonable doubt that defendant was guilty of murdering Sophia Glover.

Defendant also argues insufficient evidence supported the special circumstance allegation that he killed Glover while engaged in the commission or attempted commission of a felony, i.e., forcible sodomy. Critically, a rectal swab from the victim revealed the presence of sperm consistent with defendant's genotype. Glover's clothes were found neatly folded in an alley near to where her body was found, which was consistent with defendant's attacks on Maria R., Bertha R., and Karen M. He apparently convinced women to engage in consensual sex but turned suddenly violent, beating and strangling them and then forcing them to engage in additional sex acts. The jury could reasonably infer he committed a forcible sodomy from the presence of sperm, the DNA evidence linking him to the victim, the manner of Glover's violent murder, the location of her body (she was found near the Wilsie home on Mississippi Street where defendant's mother worked), and the evidence of defendant's intent and modus operandi in committing similar crimes against several other victims within the same timeframe and general location. Because sufficient evidence supports the felony-murder special circumstance, the jury necessarily found defendant guilty of first degree murder on a felony-murder theory, so we need not address his further claim there was insufficient evidence of premeditation and deliberation.

### c. Karen M.

Defendant contends insufficient evidence supports his conviction for the crimes involving Karen M. The victim testified that on October 20, 1986, defendant drove up to her on the street in a blue/gray Datsun 280Z and solicited an

80

act of prostitution.  She agreed, and he took her to the Wilsie home on Mississippi Street.  Once there, he began choking her and said he would kill her if she did not comply with his demands.  She had with her a bottle of liquor, and he forced her to drink it before sexually assaulting her.  She passed out due to the alcohol and was found later by Mrs. Wilsie's daughter-in-law, Marjorie Wilsie, who called police.  Karen M. testified she told police she had been raped but they did not believe her.  Karen M. admitted she was a prostitute and had several convictions for prostitution.  She was hoping to obtain favorable treatment in another case by testifying against defendant but was unsuccessful in doing so.

Noting her criminal history, her intoxication, and inconsistencies in her story, defendant contends Karen M. was "inherently unreliable" and her testimony "lacked credibility."  But it is not for us to say on appeal whether she was worthy of the jury's belief.  Nothing to which she testified was physically impossible or even implausible.  "If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)  "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.)  As is standard, the jury was instructed:  "You should give the testimony of a single witness whatever weight you think it deserves.  However, testimony by one witness, which you believe, concerning any fact is sufficient for the proof of that fact." (See CALJIC No. 2.27.)  We assume that because the jurors convicted defendant of the charges involving Karen M., they found her a credible witness.  Accordingly, sufficient evidence supports the jury's verdict on those counts.

81

### d. Motion for Acquittal (Section 1118.1)

Following the close of the prosecution's case-in-chief at the guilt phase, defendant moved for acquittal on count two, the murder charge involving Tara Simpson, claiming the prosecution had failed to present sufficient evidence of guilt.  As counsel argued:  "[T]here is nothing which connects [defendant] to that murder at all but for where he lives; just the opportunity portion that I am sure the—they will argue.  [¶]  There was some acid phosphatase that [was] recovered, but there is nothing to indicate at all that those are—were either identified or anything of that nature."  The trial court denied the motion, saying:  "With respect to Tara Simpson, there is no question in the court's mind that this will pass muster under 1118.1."  Defendant now argues the trial court erred by denying the motion because no solid and reliable evidence tied him to the crime.

Section 1118.1 provides in pertinent part:  "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."  As we explained in *People v. Coffman and Marlow*, *supra*, 34 Cal.4th 1, 89:  "The test applied by the trial court in ruling on a motion for acquittal is the same test applied by the appellate court in reviewing a conviction for sufficiency of the evidence, namely, to determine whether from the evidence then in the record, including reasonable inferences to be drawn therefrom, there is substantial evidence of the existence of every element of the offense charged."

At the threshold, it is unclear how the trial court's denial of defendant's motion of acquittal of Simpson's murder prejudiced defendant because the jury failed to convict him of that charge.  Defendant suggests he was prejudiced

82

because the trial court specifically allowed the jury to consider Simpson's murder as an aggravating circumstance under section 190.3, factor (b), which authorizes a capital jury to weigh "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." But the court also instructed the jury it must find defendant committed that act beyond a reasonable doubt (see *People v. Avena* (1996) 13 Cal.4th 394, 429-430), eliminating any unfairness, for we assume no jurors considered the facts of Simpson's murder unless they found those facts true beyond a reasonable doubt.

Assuming without deciding that the trial court's denial of defendant's section 1118.1 motion could be prejudicial, we find the court did not err. Simpson's murder occurred during a timeframe in which African-American prostitutes or homeless women using El Cajon Boulevard in San Diego as a base were being sexually assaulted, beaten and strangled, often causing their death. None was shot with a gun. The victims were usually drug users. Simpson's body, like those of Glover, Sweets and Carpenter, was found discarded like garbage in close proximity to one of two residences defendant was known to use. DNA evidence linked defendant to some, but not all, of the victims. Three surviving victims largely fitting the pattern (Maria R., Bertha R., and Karen M.) identified defendant as their assailant. Accordingly, at the time the defense made its motion for acquittal, the evidence and the reasonable inferences the jury could have drawn from it comprised substantial evidence that defendant killed Simpson. (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 89.)

Defendant also argues the trial court should have entered a judgment of acquittal on count three, which charged him with murdering Trina Carpenter. Although he moved for acquittal on count two (Tara Simpson), defendant did not include count three in his motion and thus forfeited the claim for appeal. (*People*

83

*v. Smith* (1998) 64 Cal.App.4th 1458, 1464.) Were we to overlook defendant's omission and find the claim properly before us, and were we further to assume he could possibly have been prejudiced (for the jury hung on count three), we would reject his claim on the merits for the same reasons we stated with regard to the Tara Simpson murder; that is, sufficient evidence, along with inferences drawn from that evidence, supported the conclusion that defendant was responsible for killing Trina Carpenter due to the pattern of behavior and similarity of crimes, the interlocking circumstances among the various victims, the DNA evidence, and the eyewitness testimony from the surviving victims.

## D. Assorted Instructional Claims

Defendant contends the trial court committed several errors when instructing the jury at the guilt phase. As we explain, *post*, none of these claims has merit.

### 1. First Degree Murder

#### a. Omission of Malice Aforethought

When instructing the jury, the trial court declined to use either CALJIC No. 8.10, the standard pattern instruction defining first degree murder, or CALJIC No. 8.11, the standard instruction defining malice. Instead, the trial court chose to use its own restated modification of the standard instructions, explaining that "my instruction, as you see, takes exactly this definition [from CALJIC No. 8.10] and it just substitutes 'the killing was intentional' as opposed to 'the killing was done with malice aforethought.' " Defendant objected to the court's proposed instruction because it excised the definition of malice aforethought, but the court overruled his objection. The instruction the court eventually read to the jury failed to require it to find, as a condition of returning a verdict of first degree premeditated murder, that defendant acted with the intention *unlawfully* to take the victim's life.

84

Defendant contends the failure to instruct specifically on malice aforethought as set forth in the standard CALJIC instructions requires reversal. We need not resolve this point because any instructional error was harmless. With regard to Sophia Glover, the jury was instructed that it could convict of first degree murder on either of two theories: premeditation and deliberation, or felony murder. The jury was also instructed on the sodomy-murder special-circumstance allegation and the jury sustained this allegation. This latter finding demonstrates the jury necessarily found by a unanimous vote that defendant killed Glover while he was "engaged in the commission or attempted commission of . . . sodomy, or that the murder was committed during the immediate flight after the commission or attempted commission of . . . sodomy by the defendant," and that he intended to kill while doing so. This finding demonstrates the jury necessarily found beyond a reasonable doubt the facts supporting first degree murder on a felony-murder theory for Glover. Thus, even assuming for argument the malice instructions were faulty, any error was necessarily harmless under any standard.

*People v. Boyd* (1985) 38 Cal.3d 762 is illustrative. In *Boyd*, the defendant argued the trial court erred by instructing the jury on premeditation because the evidence was insufficient to support that theory. We found any instructional error did not require reversal because "the jury [that] found defendant guilty of first degree murder simultaneously returned a verdict finding as a special circumstance that defendant committed that murder during the commission of an attempted robbery. It also found defendant guilty of the crime of attempted robbery. *Those findings make it clear that whatever the jurors thought about premeditation, they agreed upon all of the elements necessary for a verdict of first degree murder based on a felony-murder theory*." (*Id.*, at p. 770, italics added.) Here, as in *Boyd*, "we can conclude that, at the very least, the jury reached its verdict of first degree murder [as related to Sophia Glover] under one legally proper theory. Under such

85

circumstances, there is no miscarriage of justice under article VI, section 13 of the state Constitution and reversal is not required." (*People v. Sanders* (1990) 51 Cal.3d 471, 510.) For the same reasons, no federal constitutional error occurred because any instructional error with regard to Glover would be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

For the crimes committed against JoAnn Sweets, a slightly different analytical path applies but it leads to the same destination. Although it did not do so for the murder charge involving Glover, for the Sweets murder charge the trial court instructed the jury "to consider only one theory of first degree murder, to wit: deliberate and premeditated murder." Because the jury was not given the option of convicting defendant of first degree felony murder for the Sweets murder, we cannot rely on the special circumstance findings to conclude the jury necessarily sustained all the elements of that theory of first degree murder. But any instructional error was rendered harmless by the jury's unanimous decision to sustain the sodomy-murder special-circumstance allegation for Sweets's murder. In doing so, the jury necessarily found, per the jury instructions, that defendant "intended to kill and killed to carry out or advance the rape or sodomy or to facilitate the escape therefrom or to avoid detection." Thus, the jury found defendant *unlawfully* killed her while harboring the intent to kill. That is what CALJIC No. 8.11 would have required the jury to find in any event. (CALJIC No. 8.11 ["Malice [aforethought] is express when there is manifested an intention unlawfully to kill a human being."].) Any error is thus harmless under both the state and federal Constitutions.

### b. *Alleged Inapplicability of Premeditation and Felony-murder*

Defendant next contends we must reverse his two murder convictions because the language in the information was inadequate to charge him with first

degree murder under a theory of either premeditation and deliberation or felony murder.  Because the charging language was inadequate, he claims, the trial court lacked jurisdiction to try him for murder in the first degree.  He also argues his trial for first degree murder violated his constitutional right to due process and to a fair trial and reliable penalty determination under our state and federal Constitutions.  As we explain, the legal basis of his contention is flawed.

Count four of the information charged defendant as follows:  "On or about May 9, 1986, BRYAN MAURICE JONES did willfully, unlawfully murder JOANN SWEETS, a human being, in violation of PENAL CODE SECTION 187(a)."  The language in count five (Sophia Glover) was the same except for the date.  Following the presentation of evidence, the jury was instructed on first degree murder and told to consider only one theory—premeditation and deliberation—for count four (JoAnn Sweets), but that it could consider both premeditation and deliberation and felony murder (rape) for count five (Sophia Glover).  With regard to both Sweets and Glover, the court also instructed the jury on the sodomy-murder special circumstance, i.e., whether those two killings were committed during the commission or attempted commission of a forcible sodomy.  The jury returned first degree murder verdicts on both counts and sustained the special circumstance as to both Sweets and Glover.

Defendant first contends the information's failure to include any mention of willfulness, premeditation or deliberation means he was charged with second degree murder only.  But "it has long been the law in this state that an accusatory pleading charging murder need not specify degree or the manner in which the murder was committed. . . .  Neither is it necessary to specifically plead the charged murder was wilful, deliberate, and premeditated.  [Citation.] So long as the information adequately alleges murder, the evidence adduced at the preliminary hearing will adequately inform the defendant of the prosecution's

87

theory regarding the manner and degree of killing." (*People v. Thomas* (1987) 43 Cal.3d 818, 829, fn. 5.)

To the extent defendant argues the information was faulty for mentioning section 187 and not section 189, we disagree. "[A] valid accusatory pleading need not specify by number the statute under which the accused is being charged. [Citations.] Section 952, which governs how an offense should be stated in an accusatory pleading, merely provides in pertinent part that '[i]n charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused.' " (*People v. Thomas*, *supra*, 43 Cal.3d at p. 826.)

Defendant also argues the information, by referencing section 187 but not section 189, failed to adequately charge first degree murder on a felony murder theory. Although he concedes *People v. Witt* (1915) 170 Cal. 104 held that "it is sufficient to charge the offense of murder in the language of the statute defining it," and that such charging language "includes both degrees of murder" (*id*., at pp. 107-108), he argues *Witt*'s rationale has been "completely undermined" by this court's reasoning in *People v. Dillon* (1983) 34 Cal.3d 441, that section 189 is the "statutory enactment of the first degree felony-murder rule in California." (*Dillon*, *supra*, at p. 472.) But as defendant concedes, "subsequent to *Dillon*, *supra*, 34 Cal.3d 441, we have reaffirmed the rule of *People v. Witt*, *supra*, 170 Cal. 104, that an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely. Thus we implicitly have rejected the argument that felony murder and murder with malice are

88

separate crimes that must be pleaded separately." (*People v. Hughes* (2002) 27 Cal.4th 287, 369.) Although defendant further contends that *Hughes* "never explained how the reasoning of *Witt* can be squared with the holding of *Dillon*," he is mistaken, for we explained that " 'generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing or at the indictment proceedings.' " (*Hughes*, *supra*, at pp. 369-370.) We reject his further argument that we should reexamine our precedents because he presents no persuasive reason to do so.

### 2. *Consideration of Other Crimes Evidence*

Defendant argues the instruction addressed to the jury's consideration of other charged crimes requires reversal because it was "awkward," "hopelessly confusing" and "deeply flawed," largely because of the many victims and the interlocking nature of the evidence. We reject the argument. The instruction was essentially consistent with CALJIC No. 2.50, and, contrary to defendant's argument, it was not erroneous for failing to mention the prosecution's burden of proof. Nor was the instruction flawed for failing to guide the jury on how to use evidence of the other charged crimes to prove intent and motive. In addition to giving the basic instruction, the court instructed the jury that "[y]ou may also consider other counts' evidence together with the count under consideration to determine whether there existed in the mind of the perpetrator an intent which is a necessary element of the count under consideration, or a relevant motive. You should consider whether any intent or motive is the same, different, or absent in some or all of the offenses considered." Due to the similarity of the other charged crimes and the Sweets and Glover crimes, the jury, considering the instructions as a whole, would have understood how to weigh the former crimes in proving motive and intent in the latter crimes. To the extent the instruction was

89

incomplete, defendant may not be now heard to complain because he did not request clarifying language. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Andrews* (1989) 49 Cal.3d 200, 218, quoted with approval in *People v. Hart* (1999) 20 Cal.4th 546, 622.)

Defendant also complains about the further instruction that "[i]f you should find a unique or highly distinctive method, plan, or scheme shared among other counts and the count under consideration, such that an inference of a single perpetrator for all offenses may be drawn, then you should consider whether it may be logically concluded that if the defendant committed one or more of the other crimes, he also committed the crime under consideration. Or, conversely, if he did not commit one or more of the other crimes, then it may be logically concluded that he did not commit the crime under consideration." This instruction was erroneous, he contends, because, as we stated in *People v. Ewoldt*, *supra*, 7 Cal.4th at page 394, "[e]vidence of a common design or plan, therefore, is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." That he reads *Ewoldt* out of context is clear, for we go on in that case to explain: "Evidence of *identity* is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator." (*Id.*, at p. 394, fn. 2.) There having been evidence Sweets and Glover were sexually assaulted and murdered, the jury could consider evidence of other crimes demonstrating the existence of a common plan or scheme, such as defendant's crimes against Maria R. and Karen M., and the trial court did not err in so instructing.

90

Defendant next argues the jury instructions impermissibly allowed the jury to aggregate the evidence, finding him guilty of just one crime and then parlaying that finding to find him guilty of the remaining crimes without consideration of any other evidence. "For example, the instruction meant that if the jury found that [he] attempted the murder of Maria [R.] or Karen [M.], it could logically conclude from this finding alone that [he] committed the first degree murders of Sophia Glover and JoAnn Sweets." We disagree, for the court specifically instructed the jury on the need to find beyond a reasonable doubt that defendant had committed each individual crime. The jury showed it understood this instruction by its inability to reach a verdict on the Tara Simpson and Trina Carpenter counts.[21]

Finally, we reject defendant's contention that the jury instructions "would have permitted the jury to find [he] committed a murder based on evidence short of proof beyond a reasonable doubt." Because the jury was also instructed that "[e]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt or a special circumstance must be proved beyond a reasonable doubt," we are confident the jury applied the reasonable doubt standard before returning a guilty verdict.

### 3. CALJIC. No. 2.03 (Consciousness of Guilt)

The trial court instructed the jury with CALJIC No. 2.03, the standard instruction informing the jury it may infer a consciousness of guilt from

---

[21] Defendant further argues that the "jurors who did not vote guilty on the Carpenter and Simpson murder counts could have used those counts to determine identity in the Glover and Sweets [charges] without first finding that the prosecution had proved the Carpenter and Simpson counts by a preponderance of the evidence." That any jurors did so, however, is mere speculation. To the extent the instruction, which was otherwise correct, was vague, defendant cannot now complain as he did not ask the court to modify the instruction. (*People v. Holloway* (2004) 33 Cal.4th 96, 154.)

defendant's willfully false or misleading statements. Defendant contends this instruction was duplicative, argumentative, "unfairly partisan," and permitted the jury to draw unwarranted or even irrational inferences about his state of mind. He also contends these alleged state-law violations transgressed several of his state and federal constitutional rights. Assuming without deciding defendant preserved this issue for appellate review, we conclude the claim lacks merit. We have rejected defendant's exact claims many times (see, e.g., *People v. Moore*, *supra*, 51 Cal.4th at pp. 413-414), as defendant concedes. Although he urges this court to reconsider these past decisions, arguing they are based on the mistaken analysis first set forth in *People v. Crandell* (1988) 46 Cal.3d 833, we have rejected that precise claim as well. (*People v. Page* (2008) 44 Cal.4th 1, 51.) We thus have no reason to disavow *Crandell*'s assessment that a reasonable juror instructed with CALJIC No. 2.03 "would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' " (*Crandell*, at p. 871.) As defendant fails to persuade us that a reexamination of these precedents is warranted, we reject his state law and constitutional claims of error.

### 4. CALJIC No. 2.51 (Motive)

Defendant argues the standard jury instruction on motive, CALJIC No. 2.51, which states that motive is not an element of the crime but is a circumstance the jury can consider, violated his state and federal constitutional rights by allowing the jury to determine his guilt based on proof of motive alone, by improperly lightening the prosecution's burden of proof, and by shifting the burden of proof such that defendant was required to prove his innocence. We have many times rejected these exact claims (see, e.g., *People v. Whalen* (2013) 56 Cal.4th 1, 71; *People v. Kelly* (2007) 42 Cal.4th 763, 792), and we find no reason to reexamine those prior decisions.

92

*5. Reasonable Doubt*

Defendant argues various instructions addressing the concept of reasonable doubt (CALJIC Nos. 2.90, 2.01, 2.02, 8.83, 8.83.1) violated his state and federal constitutional rights to due process, trial by jury, and a reliable penalty determination, both by (a) allowing the jury to convict him "using a standard [of proof] lower than proof beyond a reasonable doubt" by stating the jury "must" draw an incriminatory inference if it appeared reasonable, and by (b) creating an impermissible mandatory presumption "that required the jury to accept any reasonable incriminatory interpretation of the circumstantial evidence."

We reject the argument. As we have explained: "Examination of the full instructions shows defendant's concern to be groundless. Two of the instructions defendant complains of (CALJIC Nos. 2.01, 8.83) explicitly told the jury that every fact necessary to circumstantial proof of an offense or a special circumstance must be shown beyond a reasonable doubt. All the instructions complained of explicitly told the jury that if two possible inferences, both reasonable, could be drawn from the circumstantial evidence, the jury was required to reject the inference pointing to guilt or the presence of a required mental state and accept only the inference pointing to innocence or the lack of a required mental state. The instructions told the jurors they must accept a reasonable inference pointing to guilt *only* where any other inference that could be drawn from the evidence was *unreasonable*. That direction is entirely consistent with the rule of proof beyond a reasonable doubt, because an *unreasonable* inference pointing to innocence is, by definition, not grounds for a *reasonable* doubt. The circumstantial evidence instructions are thus correct." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1058.)

Defendant further argues seven other jury instructions (CALJIC Nos. 1.00, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, and 2.52) "individually and collectively diluted the

93

constitutionally mandated reasonable doubt standard." According to defendant, "[e]ach of these instructions, in one way or another, urged the jury to decide material issues by determining which side had presented relatively stronger evidence," thereby reducing the prosecution's high burden of proof beyond a reasonable doubt. As defendant concedes, we have previously rejected these claims in other cases, but he argues this court should reexamine our prior precedents because they are "fundamentally flawed," in that prior cases have relied on the plain meaning of an instruction's language rather than considered how a reasonable juror would have applied the instruction. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 ["in reviewing an ambiguous instruction . . . , we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1298 [same].)

Defendant's argument is untenable. For example, we explained in *People v. Jennings* (1991) 53 Cal.3d 334, 386, that "[t]he plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. *No reasonable juror would have interpreted these instructions* to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt." (Italics added.) Accordingly, we conclude, consistent with past authority (*People v. Watkins* (2012) 55 Cal.4th 999, 1030), that none of the identified pattern jury instructions violated defendant's constitutional rights.

### 6. *Unanimity*

The jury was instructed on two theories of first degree murder: premeditated murder and felony murder. Defendant argues the trial court erred by instructing the jury that it need not conclude either theory was true by a unanimous

vote, so long as it was unanimous in concluding defendant was guilty of first degree murder on some theory.[22]  Again claiming that malice murder and felony murder are different crimes with different elements, he argues the trial court's failure to require the jury unanimously to support a single theory of first degree murder is structural error requiring reversal.

We have rejected this precise claim in previous cases (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1354; *People v. Benavides* (2005) 35 Cal.4th 69, 100-101), and defendant presents no persuasive reason to reexamine our precedents. We thus reject the claim.

## II.  PENALTY PHASE

### A.  Facts

#### *1.  Aggravation*

The prosecution called four witnesses who presented aggravating evidence. The first, defendant's sister L.A., testified that when defendant was 11 or 12 years old, he several times forced her to have sex against her will.

Tracy Davison testified that she met defendant when they both attended the Job Corps in San Diego.  She was 15 years old and he was 17, and she eventually became pregnant by him.  She thereafter lived with him and his mother on 51st Street for three years but never married him.  Once, when he was jealous, he placed both his hands on her neck and choked her until she passed out.  She left him and eventually married another man.  She related an incident that occurred on October 1, 1985, which was about one month after police found Tara Simpson's

---

[22]    The jury was instructed:  "A finding of guilt of first degree murder in counts three and five may be based upon either one or both of the proposed theories.  The jury does not have to agree unanimously as to which theory has been proved, but all twelve jurors must be convinced beyond a reasonable doubt that defendant is guilty under one or the other, or both theories."

burned body, in which her then husband, David Entzminger, and defendant got into a fight. Defendant picked Entzminger up by the neck and threw him against a van. Davison estimated her husband was five feet seven inches tall and weighed 130 or 140 pounds. By contrast, she estimated defendant was six feet six inches tall and weighed about 300 pounds. Her husband later obtained a restraining order against defendant. On another occasion, defendant assaulted Davison and chipped her tooth. She admitted she worked as a prostitute.

Sometime between September 1985 and July 1986, Davison saw defendant with a prostitute near the 51st Street apartment. He told the woman in a "[v]ery hostile and aggressive" voice: "Bitch, get my money." She identified the prostitute as murder victim Trina Carpenter.

Aida L. testified she worked as a prostitute in San Diego in 1986 and admitted she had a prior felony conviction for theft. She was also addicted to heroin at the time. On February 13, 1986, two days after police found Trina Carpenter's body in a dumpster, the witness testified she was walking alone late at night on El Cajon Boulevard when defendant attacked her. He grabbed her arm, took her down an alley and into an underground parking lot, and forced her to orally copulate him. He then raped her, and after he was finished he grabbed her neck and choked her. He told her: " 'You better not say anything. You better not scream. You better not tell the police or I am going to kill you.' " She reported the crime but police did not believe her.

Bertha R. testified to the effect of her victimization by defendant. She said that after defendant sexually assaulted her, she starting drinking heavily and abusing cocaine and crystal methamphetamine. Her boyfriend showed little compassion towards her and began treating her differently. When she told him she did not want to have sex, he cruelly replied that she deserved to be raped. She began secluding herself in her room to drink, and she sent her son to her sister's

96

home "so I wouldn't have to be bothered with him." She lost her job and began working the streets as a prostitute to make money for alcohol and drugs. Although she had been seeing a therapist, she stopped therapy because she "was too ashamed of what I was doing." At the time of trial, more than seven years after defendant assaulted her, she had turned her life around and was again employed and no longer abused alcohol and drugs, although her son was now living "on the streets."

## 2. *Mitigation*

Defendant presented several witnesses who testified as to his character and background. His mother, Ann Jones, related defendant's upbringing near Barstow and how he did not do well in school and spent two weeks in juvenile hall after being caught burglarizing homes when he was 13 years old. When her husband returned from Okinawa after a tour of duty with the Marines, family life changed. Her husband was a changed man, suspicious of everything she did. Once, when she refused to give him any money, he tried to kill her by choking her until defendant intervened. Her husband also beat her daughter, L.A., and once broke defendant's arm. When her husband gambled away their savings, she sold the house and moved to San Diego. Jones was unaware of defendant's arrests or that he had been convicted of crimes against Bertha R. She believed him when he told her he had been falsely accused and did not believe defendant ever molested his sister because he denied it.

Tracy Davison's older sister, Linda Tate, testified defendant was a good father. His son, now being raised by Jones, testified that he loved his father, who encourages him by phone and in letters to do well in school and practice sports and music. He would feel "horrible" and "really sad" if his father was not around to speak with him.

97

People who knew defendant in the Job Corps testified he did well in that structured environment, posed no behavioral problems, and in fact helped to defuse problems.  He completed the welding program and  was considered a good welder with marketable skills.  People who knew defendant in county jail and in prison testified to his positive qualities and diligence in work programs.

## B.  Issues

### 1. Victim Impact Evidence

Defendant raises several arguments against the admission of Bertha R.'s penalty phase testimony, but none has merit.  Although defendant's crimes against Bertha R. were committed at a time when victim impact evidence was inadmissible (*Booth v. Maryland* (1987) 482 U.S. 496), the law had changed by the time he was tried in 1994 (*Payne v. Tennessee* (1991) 501 U.S. 808).  Defendant contends application of *Payne* to his case violates the ex post facto clauses of both the state and federal Constitutions and is unconstitutionally vague.  We disagree.  "We have rejected claims that section 190.3, factor (a), is unconstitutionally vague insofar as it permits introduction of victim impact evidence as a circumstance of the crime [citations], and that use of victim impact evidence in trials for capital crimes committed before the United States Supreme Court's decision in *Payne v. Tennessee, supra,* 501 U.S. 808, violates federal constitutional principles of ex post facto and due process [citation].  Defendant does not persuade us to reconsider these decisions."  (*People v. Jurado* (2006) 38 Cal.4th 72, 132.)  We have reached the same result concerning the state constitutional claim.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 926.)

Defendant also contends the trial court erred by overruling his objection to the admission of Bertha R.'s testimony on grounds it was not related to the circumstances of the capital crimes.  We reject the argument, for the evidence of

98

prior violent acts admitted under section 190.3, factor (b), may include the effect of noncapital crimes on the surviving victim. "At the penalty phase, the prosecution may introduce evidence of the emotional effect of defendant's prior violent criminal acts on the victims of those acts." (*People v. Price* (1991) 1 Cal.4th 324, 479.) "The foreseeable effects of defendant's prior violent sexual assaults upon the victims — ongoing pain, depression, and fear — were thus admissible as circumstances of the prior crimes bearing on defendant's culpability." (*People v. Mickle* (1991) 54 Cal.3d 140, 187.) We recently cited *Mickle* with approval and declined an opportunity to reconsider it. (*People v. Jones* (2012) 54 Cal.4th 1, 73; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 39.)

Defendant next contends that even if some of Bertha R.'s evidence was admissible as victim impact evidence, it was much too extensive to withstand constitutional scrutiny. Even assuming he preserved this issue, it lacks merit, for the trial court acted well within its discretion in admitting the evidence, which was extremely brief, comprising but seven pages in the trial transcript.

Defendant next contends the prosecutor "exceeded the boundaries of permissible victim impact argument to the jury in commenting on victims not directly related to JoAnn Sweets and Sophia Glover." Defendant did not object to this argument and thus forfeited the issue for appeal. (*People v. Brown* (2004) 33 Cal.4th 382, 398-399.) In any event, it was permissible to reference Bertha R.'s penalty phase testimony in closing argument. (*People v. Gamache* (2010) 48 Cal.4th 347, 390 [prosecutor has wide latitude in closing argument].)

### 2. *Incest Evidence*

Defendant argues the trial court erred by permitting his sister, L.A., to testify that when he was 11 and 12 years old he forced her to have sex with him. Analogizing to *Thompson v. Oklahoma* (1988) 487 U.S. 815, wherein the high

court found the Eighth Amendment prohibits imposing the death penalty on those who committed their capital crimes when they were less than 16 years old, defendant argues that allowing the jury to consider, as aggravating evidence, events that occurred before he attained the age of majority similarly violates his constitutional rights.

Although defendant moved to exclude L.A.'s testimony, he did not raise this specific ground for exclusion. "Evidence Code section 353, subdivision (a) requires that an objection to evidence be 'timely made and so stated as to make clear the specific ground of the objection or motion . . . .' As we have explained: ' "Specificity is required both to enable the court to make an informed ruling on the . . . objection and to enable the party proffering the evidence to cure the defect in the evidence." ' " (*People v. Mills*, *supra*, 48 Cal.4th at p. 207.) Under the circumstances, we agree with respondent that defendant forfeited this issue for appeal.

Were we to conclude defendant properly preserved this claim for our review, we would find it meritless. As defendant recognizes, we rejected this precise claim in *People v. Raley* (1992) 2 Cal.4th 870. In *Raley*, the defendant, also relying on *Thompson v. Oklahoma*, *supra*, 487 U.S. 815, argued, "the admission of evidence of juvenile misconduct violates the Eighth Amendment of the United States Constitution because it permits aggravation of sentence for the capital crime for conduct not considered criminal when it occurred." (*Raley*, p. 909.) We rejected the argument because the analogy to *Thompson* was inapt: the defendant's death penalty sentence " 'is attributable to [his] current conduct, i.e., murder with a special circumstance finding, not his past [juvenile] criminal activity.' " (*Ibid*., quoting *People v. Cox* (1991) 53 Cal.3d 618, 690.) As defendant was not a minor when he committed his crimes against JoAnn Sweets, Sophia Glover, Maria R. and Karen M., *Thompson* is inapplicable.

100

Defendant argues *Roper v. Simmons* (2005) 543 U.S. 551, in which the high court found the Eighth Amendment prohibited imposing the death penalty on those under 18 years old at the time of their crimes, supports reconsideration of *Raley*. We disagree. Although *Roper* increased the minimum age for the ultimate penalty under the Eighth Amendment, it does not undermine our reasoning in *Raley* that a capital offender's penalty is attributable to his present capital crimes, not his past criminal activity.

### 3. *Instruction to Disregard Guilt Phase Instructions*

As is usual in capital cases, upon reaching the penalty phase the trial court instructed the jury with CALJIC No. 8.84.1 (1989 rev.), which in part instructs the jury it "must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. *Disregard all other instructions given to you in other phases of this trial*." (Italics added.) Defendant contends the last sentence of this instruction, and the failure to reinstruct the jury with approximately 40 different guilt phase instructions, was constitutional error requiring reversal because it was reasonably likely the omission of these instructions precluded the jury from considering relevant mitigating evidence. Defendant is correct that the challenged instruction presupposes the court will, at the penalty phase, reinstruct the jury with the guilt phase instructions applicable to the penalty phase. "As we have held, if the court tells the jury to disregard the guilt phase instructions, 'it must later provide it with those instructions applicable to the penalty phase.' (*People v. Moon*[ (2005)] 37 Cal.4th [1,] 37.) We reiterate that trial courts should take pains to ensure that penalty phase juries are fully and properly instructed. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1222; *Moon*, at p. 37, fn. 7.)" (*People v. Harris* (2008) 43 Cal.4th 1269, 1319.)

To the extent defendant argues the trial court committed reversible error, however, he is incorrect because the trial court was not remiss in this area. It reinstructed the jury at the penalty phase with numerous guilt phase instructions dealing with how to consider the evidence, thereby satisfying the rule set forth in *People v. Moon*, *supra*, 37 Cal.4th 1, and subsequent decisions. To the extent defendant simply lists dozens of guilt phase instructions without explaining how they were pertinent to the penalty phase deliberations, his argument fails to persuade. For example, it is unclear how an instruction on corpus delicti was pertinent to the penalty determination. Although the jury may have benefited from reinstruction with some of the listed instructions, we can see no prejudice from the omission.

Defendant also contends that because one juror was excused after the guilt phase and an alternate inserted into the jury at the beginning of the penalty phase, the court's failure to reinstruct with all prior guilt phase instructions, and to further instruct the jury to set aside any previous discussion about defendant's guilt and to deliberate the issue of guilt anew, was prejudicial error. He is mistaken. The obligation to instruct the jury to begin deliberations anew following replacement of a juror with an alternate does not apply when the alternate joins the jury before the start of penalty phase deliberations. "Neither does the United States Constitution demand such an instruction in the present situation." (*People v. Ashmus* (1991) 54 Cal.3d 932, 1005.)

Defendant argues the court's failure to reinstruct with all the guilt instructions prevented the jury from considering any lingering doubt it may have had regarding his guilt for murdering and sodomizing JoAnn Sweets and Sophia Glover. We reject the claim because the jury was specifically instructed that "[i]f you have any residual doubts about the circumstances attending the crimes as found in the guilt phase, you may consider such doubts in mitigation under factor

'a' of the penalty phase factors.  [¶]  Residual doubt is defined as that state of mind between 'beyond a reasonable doubt' and 'beyond all possible doubt.' "  His additional claim the failure to reinstruct precluded the jury from questioning his guilt for killing Trina Carpenter and Tara Simpson is similarly misguided because the jury was also instructed that "[b]efore a juror may consider any such criminal act as an aggravating circumstance in this case, he or she must first be satisfied *beyond a reasonable doubt* that the defendant did, in fact, commit such criminal act and that the act involved the express or implied use of force or violence or the threat of force or violence."  (Italics added.)  We find no error.

### 4.  *Challenges to the Death Penalty Law*

Defendant raises several facial challenges to the constitutionality of this state's death penalty law, all of which this court has previously rejected in numerous decisions.  As he presents no persuasive reason to reconsider our precedents, we reject his arguments:

a.  " 'Comparative intercase proportionality review of death sentences is not constitutionally required.  [Citations.] "Because capital and noncapital defendants are not similarly situated in the pertinent respects, equal protection principles do not mandate that capital sentencing and sentence-review procedures parallel those used in noncapital sentencing." ' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 732.)

b.  Nothing in the state or federal Constitutions " ' "require[s] that the prosecution carry the burden of proof or persuasion at the penalty phase, . . . or that the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved, (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence." ' 'The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee

103

(*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* [(2000)] 530 U.S. 466) have not altered our conclusions in this regard.' [Citation.]" (*People v. Bivert*, *supra*, 52 Cal.4th at pp. 123-124.)

c. CALJIC No. 8.88 is not impermissibly vague or ambiguous for using the phrase "so substantial," nor did it impermissibly fail to inform the jury that it must find death was an appropriate, not just an authorized, penalty. (*People v. McDowell*, *supra*, 54 Cal.4th at p. 444.) Nor is CALJIC No. 8.88 unconstitutional for failing to require the jury to return a verdict of life should it determine the mitigating circumstances outweigh the aggravating ones. (*McDowell*, at p. 444.) "Nor is the instruction defective because it fails to convey to jurors that defendant has no burden to persuade them that death is inappropriate." (*People v. Taylor* (2010) 48 Cal.4th 574, 658.)

d. The death penalty law is not unconstitutional "[d]ue to the asserted overbreadth of section 190.3, factor (a), which permits the jury to consider the circumstances of the crime as an aggravating factor [citation]." (*People v. Vines*, *supra*, 51 Cal.4th at p. 891.)

e. "The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b)" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 334), and need not first decide the prior criminal activity was true beyond a reasonable doubt by unanimous vote (*People v. Abilez*, *supra*, 41 Cal.4th at p. 534). Further, permitting the jury to consider prior unadjudicated criminal activity as aggravating evidence did not unconstitutionally allow it to impose the death penalty on unreliable, undiscussed, or undebated evidence, especially because the jury was instructed that no juror could consider such evidence unless

104

he or she found beyond a reasonable doubt that defendant had committed the crime or crimes. (*People v. Avena*, *supra*, 13 Cal.4th at p. 429.)

f. No rule of constitutional law requires the jury instructions to delete inapplicable sentencing factors or to state that some factors are mitigating only. (*People v. Mills*, *supra*, 48 Cal.4th at p. 210.)

g. The jury instructions for section 190.3, factors (d) and (g) are not unconstitutional for including the adjectives "extreme" and "substantial." (*People v. Lightsey*, *supra*, 54 Cal.4th at pp. 731-732.)

h. The jury instructions' failure to require specific written findings regarding which aggravating factors were found and considered in returning a death sentence did not violate defendant's constitutional rights to meaningful appellate review and equal protection of the law. (*People v. Homick* (2012) 55 Cal.4th 816, 903.)

i. Assertedly denying some procedural protections to capital defendants that would apply to noncapital defendants does not violate equal protection. (*People v. Bivert*, *supra*, 52 Cal.4th at p. 124.)

### 5. *International Law*

Defendant contends the death penalty law in California contravenes "international treaties and fundamental precepts of international human rights . . . as incorporated into the Eighth Amendment." In particular, he cites the International Covenant on Civil and Political Rights, ratified by the United States in 1992. We have rejected this precise claim (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1072) and decline to reconsider it here.

### 6. *Cumulative Error*

Having found no legal error, we reject defendant's claim that the cumulative effect of all errors requires reversal.

## III. CONCLUSION

The judgment is affirmed in its entirety.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**

**CONCURRING OPINION BY LIU, J.**


I write separately to offer brief comments on two issues in this case. First, consistent with the views I recently expressed in *People v. Harris* (Aug. 26, 2013, S081700) __ Cal.4th __, __ (*Harris*) (conc. opn. of Liu, J.), *People v. Mai* (Aug. 26, 2013, S089478) __ Cal.4th __, __ (*Mai*) (conc. opn. of Liu, J.), and *People v. Williams* (2013) 56 Cal.4th 630, 699 (*Williams*) (dis. opn. of Liu, J.), I would analyze defendant's claim under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 as follows.

With respect to Prospective Juror Y.J., the trial court said it was "completely satisfied . . . that [the prosecutor's] reasons [were] independent of color," with no other findings or analysis. Although today's opinion gives the trial court's ruling the "usual deference" (maj. opn., *ante*, at p. 15), deference to an unexplained *Batson* ruling is unwarranted. (See *Mai*, *supra*, __ Cal.4th at p. __ [at p. 2] (conc. opn. of Liu, J.); *Williams*, *supra*, 56 Cal.4th at pp. 710–713, 715 (dis. opn. of Liu, J.).) But an independent examination of the record confirms that defendant failed to establish purposeful discrimination with respect to the prosecutor's strike of Y.J. The prosecutor said he excused Y.J. because, among other reasons, she worked at the Job Corps defendant had attended nine years earlier. The prosecutor explained that he anticipated the defense might introduce information about defendant's history at Job Corps during the penalty phase, and he didn't want to "take the chance that . . . [Y.J.] will have a link to [defendant]

1

because of her employment and his connection to Job Corps." There is no indication that any of the seated or alternate jurors had a similar connection to defendant. I conclude from the record that defendant has not shown it is more likely than not that the prosecutor's reference to Y.J.'s employment at Job Corps was pretextual.

Prospective Juror C.G. said during voir dire that she was seeing a therapist for depression: "The past four years have been pretty rough. I don't have — I don't have a husband. I don't have children. So I had a dog that was like a child to me. I had the dog for six years. In the past four years I have had to get rid of the dog of six years, I have lost a boyfriend of ten years, and I have had a stroke. So the past four years have been kind of depressing." In explaining his reasons for excusing C.G., the prosecutor said: "And the — a big factor is that she's seeing a therapist now regarding depression. No matter what she says, this will be a depressing case. I don't want the responsibility of harming this woman. I think she's going to be harmed based on what she has to hear in this case and what she has to do in this case. And I don't want that or someone with that background, that current background, sitting on a case of this magnitude." The trial court declared itself "very satisfied that the reasons stated are substantial and do not relate to color whatsoever." It then said: "I will indicate that I noticed [Prospective Juror C.G.] almost looked like she was in tears when she was explaining the tragedies she has personally gone through over the last few years and it's pretty heart-breaking." This on-the-record finding makes it appropriate for us to "defer . . . to the trial court's assessment of the prosecutor's reasons as being subjectively genuine." (Maj. opn., *ante*, at p. 16.)

With respect to N.S., the trial court ruled that defendant had failed to make a prima facie showing of discrimination, stating: "[I]t was very clear to me that . . . [N.S.] was [not] going to get past a prosecution peremptory, and it wouldn't

2

have mattered what color [she was]. . . . [N.S.], of course, had the fact that she had married an individual who was convicted of murder, that she had that incredible experience behind her. . . . So, I — just in this case I am confident that there is no prima facie case." We can confidently conclude that the reason the prosecutor struck N.S. was obvious: N.S. was married to a convicted murderer. None of the seated or alternate jurors had anything remotely similar in their backgrounds. This is a circumstance "where the explanation for a prosecutor's strike of a particular juror is so obvious that there is little or no reason to think anything else could have motivated the strike." (*Harris*, *supra*, __ Cal.4th at p. __ [at p. 14] (conc. opn. of Liu, J.).)

Second, I believe the trial court erred in admitting expert testimony derived from dot intensity analysis. Dr. Edward Blake testified as an expert for the prosecution and explained his conclusions regarding the genetic material found at three of the crime scenes. (Maj. opn., *ante*, at pp. 43–44.) Before trial, defendant moved to exclude Dr. Blake's intended testimony on the ground that his conclusions were derived, at least in part, from his use of dot intensity analysis, a method defendant claimed was not generally accepted in the scientific community. (*Id.* at p. 47.) The trial court held a hearing pursuant to *People v. Kelly* (1976) 17 Cal.3d 24 and determined from the evidence presented that that "[Dr.] Blake's procedures have been substantiated as correct scientific procedures." (Maj. opn., *ante*, at p. 49.) Today's opinion declines to reach the merits of defendant's argument, instead concluding that any error was harmless. (*Id.* at p. 51.) I agree with the finding of harmlessness, but I would further conclude that the trial court, in its crucial gatekeeping role, should not have admitted the portion of Dr. Blake's testimony derived from dot intensity analysis.

The proponent of evidence derived from a new scientific technique must establish, among other things, that "the reliability of the new technique has gained

3

general acceptance in the relevant scientific community." (*People v. Doolin* (2009) 45 Cal.4th 390, 445 (*Doolin*).) "Whether a new scientific technique has gained general acceptance is a mixed question of law and fact. [Citation.] '[W]e review the trial court's determination with deference to any and all supportable findings of "historical" fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance.' " (*Id.* at p. 447.)

In this case, the evidence does not support a conclusion that dot intensity analysis had gained general acceptance in the scientific community at the time of trial. The Attorney General argues that Dr. Blake's testimony was supported by his own opinion as well as two articles submitted to the trial court as exhibits. However, one of the two articles, which was co-authored by Dr. Blake, included only a single page of discussion (plus two images labeled "Figs. 1 and 2") regarding the analysis of mixed samples. (Blake et al., *Polymerase Chain Reaction (PCR) Amplification and Human Leukocyte Antigen (HLA)-DQα Oligonucleotide Typing on Biological Evidence Samples: Casework Experience* (1992) 37 J. Forensic Sci. 700, 706–707.) That brief section of the article concluded that "studies of experimental mixtures of different DNA samples in *known proportions* indicate that mixtures in which the concentration of the two components is sufficiently different *can often be interpreted*, and the contributing genotypes identified." (*Id.* at p. 706, italics added.) This conclusion was apparently based on the authors' observation that when "two purified DNA samples of different genotypes" were mixed in known ratios, "the dots corresponding to the minor component [were] less intense than the C dot when that component [was] approximately less than 1 part in 16." (*Ibid.*) The authors did not claim that dot intensity analysis had proven successful in typing mixed samples in which the ratio of the contributing samples was not known to researchers in advance. The second article, while somewhat more thorough, also failed to include a study in which dot intensity analysis was successfully used to type mixed samples of unknown

proportions.  (See Comey & Budowle, *Validation Studies on the Analysis of the HLA DQα Locus Using the Polymerase Chain Reaction* (1991) J. Forensic Sci. 1633.)

Further, Dr. Blake's opinion was contradicted by a 1992 publication authored by the National Research Council (NRC).  (NRC, DNA Technology in Forensic Science (1992).)  The NRC advised that "[m]ixed samples can be very difficult to interpret, because the components can be present in different quantities and states of degradation. . . .  Typically, it will be impossible to distinguish the individual genotypes of each contributor.  If a suspect's pattern is found within the mixed pattern, the appropriate frequency to assign such a 'match' is the sum of the frequencies of all genotypes that are contained within (i.e., that are a subset of) the mixed pattern." (*Id.* at p. 59.)  The NRC explained that "PCR can be qualitatively faithful but quantitatively unfaithful, because some alleles amplify more efficiently than others.  A sample might contain a 50:50 mixture of two alleles and yield an amplified product with a 90:10 ratio." (*Id.* at p. 64.)  Accordingly, the NRC concluded that "it is not possible to separate the DNA contributed by different persons in mixed bloodstains or in sexual-assault samples that involve two or more perpetrators. . . .  Interpretations based on quantity can be particularly problematic — e.g., if one saw two alleles of strong intensity and two of weak intensity, it would be improper to assign the first pair to one contributor and the second pair to a second contributor, unless it had been firmly established that the system was quantitatively faithful under the conditions used." (*Id.* at p. 66.)  Although Dr. Blake opined that certain of the NCR's findings were not applicable to PCR amplification involving DQα, the report's conclusions were categorical and included no such qualification.

If our task were to determine whether the trial court's ruling was supported by substantial evidence, I would conclude that Dr. Blake's testimony and the accompanying articles were sufficient.  However, the pertinent question is whether dot intensity analysis "ha[d] gained *general acceptance* in the relevant scientific

5

community." (*Doolin*, *supra*, 45 Cal.4th at p. 445, italics added.)  Even when the trial court's "findings of 'historical' fact [and] credibility" are accorded deference (*id.* at p. 447), the evidence presented was insufficient to establish general scientific acceptance of the dot intensity technique.

The circumstances here provide an occasion to emphasize that trial courts play a vital gatekeeping role when it comes to expert testimony whose underlying conceptual or methodological basis has not been shown to be reliable.  (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769–772; see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (2007) 551 U.S. 308, 327, fn. 8; *Kumho Tire Co. v. Carmichael* (1999) 526 U.S. 137, 141.) Given the particularly persuasive power of DNA evidence, trial courts must be vigilant to ensure that the proponent of such evidence has established its reliability.

In all other respects, I join the court's opinion.


LIU, J.

6

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Jones
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S042346
**Date Filed:** August 26, 2013
_____

**Court:** Superior
**County:** San Diego
**Judge:** Laura P. Hammes
_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Joseph E. Chabot and Nina Wilder, Deputy State Public Defenders, and Lisa Anne D'Orazio for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joseph E. Chabot
Deputy State Public Defender
221 Main street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Karl T. Terp
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2194